**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

SETTLEMENT FUNDING, LLC,

                  Plaintiff,

        v.

AXA EQUITABLE LIFE INSURANCE COMPANY,

               Defendant/Third-Party Plaintiff,

        v.

ALAN RUBENSTEIN, individually,

      -and-

ALAN RUBENSTEIN, as Trustee of the
Esther Adler Family Trust 20070221,

             Third-Party Defendants

-----------------------------------------------------------------------x

NO.  09-CV-8685-HB

### THIRD-PARTY COMPLAINT OF AXA EQUITABLE LIFE INSURANCE COMPANY

      Third-Party Plaintiff, AXA EQUITABLE LIFE INSURANCE COMPANY ("AXA

Equitable"), by and through its attorneys, brings these claims against Third-Party Defendants

ALAN RUBENSTEIN, in his individual capacity, and ALAN RUBENSTEIN, as trustee of the

Esther Adler Family Trust 20070221, and alleges and avers as follows:

### NATURE OF THE THIRD-PARTY CLAIMS

      1.     These are claims for fraud; conspiracy to commit fraud, negligent

misrepresentation; violations of Ohio's Viatical Settlements Act; conspiracy to violate the Ohio

Viatical Settlements Act; and for a declaratory judgment that a life insurance policy is void *ab*

*initio* and that AXA Equitable has the right to retain premiums paid for the policy.

**THE PARTIES**

2.     Third-Party Plaintiff, AXA Equitable, is a life insurance company organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

3.     Third-Party Defendant, Alan Rubenstein, in his individual capacity, is an individual who, upon information and belief, resides at 822 Oliver Street, Woodmere, New York 11598. He is a resident and citizen of New York. He is also known as Eli Rubenstein.

4.     Third-Party Defendant, Alan Rubenstein, is the trustee of the purported Esther Adler Family Trust 20070221 ("Purported Trust"). The sole claimed asset of the Purported Trust is a life insurance policy insuring the life of the late Esther M. Adler ("Mrs. Adler"), who, at the time the policy was issued, was a resident of Ohio. Mr. Rubenstein, as trustee for the Purported Trust, represented to AXA Equitable that he was Mrs. Adler's attorney. Mr. Rubenstein is a resident and citizen of New York.

**JURISDICTION AND VENUE**

5.     This Court has supplemental jurisdiction over this third-party complaint pursuant to Section 1367(a) of the Judicial Code because the claims stated herein are so related to claims in the underlying action brought by Settlement Funding, LLC ("SF"), against AXA Equitable that they form part of the same case or controversy.

6.     This Court has personal jurisdiction over Alan Rubenstein ("Rubenstein"), both in his individual capacity and as trustee of the Purported Trust, because Rubenstein is a citizen and resident of New York and regularly conducts business in New York.

7.     Venue is proper in this United States District Court pursuant to Section 1391(a)(1) and (2) of the Judicial Code because Rubenstein resides in this judicial district and because a

number of the events or omissions giving rise to the third-party complaint occurred in this judicial district.

## FACTUAL BACKGROUND

### Stranger Originated Life Insurance

8.      In recent years, a secondary market has emerged in which speculative investors seek to obtain pecuniary interests in life insurance policies on the lives of individuals with whom they have no prior relationship.  Although it is permissible for an investor to obtain an interest in a legitimately procured life insurance policy, it is unlawful to procure a policy for the sole purpose of transferring it, directly or indirectly, to an investor.  Such arrangements are commonly referred to as STOLI, which stands for "stranger originated life insurance."

9.      STOLI investors do not acquire an interest in life insurance policies on the lives of persons with whom they have a familial relationship, or in whose longevity they possess a legally recognized interest.  Instead, these investors purchase policies that insure the lives of strangers – or, in many cases, they purchase beneficial interests in insurance trusts or ownership in shell corporations that own those policies – with the expectation that they will profit by the death of the insured.

10.      Though the STOLI market is relatively new, the underlying concept is not.  The United Kingdom Parliament enacted a statute prohibiting death-wagering as early as 1774.  In the late nineteenth and early twentieth centuries, the United States Supreme Court opined against unlawful "wagering policies," and the "sinister counter interest" in the death of the insured that results from the issuance of such policies.

11.      As a safeguard against STOLI arrangements, states have long maintained and enforced insurable interest laws, which protect the integrity of life insurance by requiring that a

policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued. Perhaps no state has gone to greater lengths to legislate against, regulate and prevent STOLI schemes than has Ohio. Ohio law requires that a life insurance policy may not be procured unless it inures to the benefit of a close relative or another person or entity considered to have an insurable interest in the life of the insured. *See* O.R.C § 3911.09. Furthermore, no insurable interest exists if the policy is purchased with the intent to resell it to a stranger at the earliest possible moment. Furthermore, Ohio's Viatical Settlements Act (the "Ohio Act") imposes limitations on the ability of a policy owner to enter into a life settlement contract that "impacts the rights of a resident of Ohio or bears a reasonable relationship to the State of Ohio." *See* O.R.C. § 3916.01(J). The Ohio Act imposes a five-year waiting period before a policy can be life settled. *See* O.R.C. § 3916.16. It also prohibits life settlement contracts involving policies that were obtained by presenting false, deceptive or misleading information. *See* O.R.C. § 3916.171(B)(4).

12.     While Ohio has gone to great lengths to protect its citizens against these STOLI transactions, it is not the only state that has taken such measures. New York has also long maintained and enforced insurable interest laws, which protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued. New York prohibits a person from procuring a life insurance policy on the life of another person who was not closely related or in which there was not a lawful economic interest. *See* N.Y. INS. LAW § 3205. Aware that STOLI was becoming more prevalent in New York, the New York Legislature recently passed a set of laws designed to regulate valid life settlements and to further bolster New York's laws against STOLI. Even though the regulation of life settlements does not take effect until May 18, 2010, the New York Legislature added

further provisions banning STOLI immediately effective upon the passage of the bill, which

occurred on November 19, 2009.  Thus, it is the public policy of New York to prevent and

eliminate STOLI.

13.     However, STOLI investors, who are the true intended owners of STOLI policies,

attempt to circumvent these laws by carefully constructing their transactions to hide the fact that

the policies are *not* being procured to satisfy legitimate insurance needs, but instead are being

procured as impermissible investments.

14.     STOLI investors seek out the highest anticipated rates of return when choosing

the life insurance policies.  This means the typical life insurance policy to which STOLI

investors gravitate insures the life of an individual aged seventy or older, with a net worth in

excess of $1 million.  These individuals can obtain large value policies, and, actuarially

speaking, are expected to have a relatively limited lifespan.  For these and other reasons, these

individuals are targeted by STOLI investors.  In even more egregious situations, STOLI

investors will misrepresent the net worth of an elderly individual to mislead the insurer into

issuing a policy with a high face value insuring the life of an individual who has no need or basis

for securing such a policy.

15.     The STOLI investors must also determine the resale value of the policy in the

secondary market.  This value is based largely upon the life expectancy of the prospective

insured.  The shorter the expected lifetime of the prospective insured, the more valuable the

policy is to those who would gamble on his or her life.  At or around the time of the application

for insurance, the prospective insured often submits to a life expectancy analysis to determine

whether the policy, if issued, would be saleable on the secondary market.

16.    Once the STOLI investors locate an individual who meets their profile, an application is submitted for one or more insurance policies. The STOLI investors typically pay most or all of the prospective insured's costs, including premium payments. STOLI investors also typically agree to pay the prospective insured a fee upon the issuance of the policy.

17.    In many cases, the policy application indicates that a third-party entity, such as a trust, a shell corporation, or a limited partnership, will be the owner and beneficiary of the life insurance proceeds. This permits the STOLI investors to acquire an interest in this holding entity -- and, most importantly, in the death benefit that later will be disbursed by the insurer – without disclosing the fact of their ownership to the insurer.

18.    While there are many other variations, all STOLI programs have one thing in common: their objective is to give investors who have no insurable interest in the life of the insured a stake in the life insurance policy of a complete stranger.

### Grant of Power of Attorney to Judith Abrams

19.    On November 23, 1990, Mrs. Adler, an Ohio resident, granted a durable general power of attorney to her daughter, Judith Abrams. This power of attorney has not been revoked and was valid through the date of Mrs. Adler's death. A copy of the Durable General Power of Attorney was attached as Exhibit "A" to AXA Equitable's Answer, Affirmative Defenses and Counterclaim (the "Answer").

20.    Upon information and belief, the power of attorney granted to Judith Abrams by Mrs. Adler was the only power of attorney granted by Mrs. Adler during her lifetime.

### Conception of the STOLI Scheme

21.    In late 2006 or early 2007, Yeruchaim Winer ("Winer"), an independent life insurance broker, Rubenstein, an as yet unidentified forger, and/or other persons or entities

- 6 -

engaged in secondary life insurance market transactions conspired to and did implement a
STOLI scheme designed to allow these persons or entities to speculate on and profit from the
death of the late Mrs. Adler. The purpose of the STOLI scheme was to further and conceal the
fraud perpetrated in order to induce AXA Equitable into issuing the Adler Policy with the plan
and intent to profit from the fraud by transferring the Adler Policy into the secondary market.

### The Purported Formation of the Purported Trust

22.     On March 2, 2007, at the direction of Rubenstein, Winer, an as yet unidentified
forger, and/or other persons or entities engaged in secondary life insurance market transactions
and in furtherance of their STOLI scheme, a document was executed that purported to establish
the Purported Trust, a lifetime trust, as of February 21, 2007 ("Trust Agreement"). A copy of the
Trust Agreement was attached as Exhibit "B" to the Answer.

23.     The Trust Agreement contained a provision stating that the Purported Trust was to
be "governed by and construed according to the laws of the State of New York." *See,* Article
Thirteen, Section A of Exhibit "B" to the Answer.

24.     The Trust Agreement named Rubenstein as the initial trustee of the Purported
Trust. *See,* Article Nine of Exhibit "B" to the Answer.

25.     The Trust Agreement purports to have been signed on March 2, 2007 by
Rubenstein and by Mrs. Adler in New York.

26.     Mrs. Adler was in Cleveland, Ohio on March 2, 2007.

27.     Mrs. Adler did not sign the Trust Agreement in New York on March 2, 2007.

28.     In fact, Mrs. Adler never signed the Trust Agreement.

29. The purported signature of Mrs. Adler on the Trust Agreement neither indicates that it was signed by nor bears any resemblance to the handwriting of Judith Abrams, to whom Mrs. Adler had given a durable general power of attorney.

30. The purported signature of Mrs. Adler on the Trust Agreement was not, in fact, signed by Judith Abrams.

31. The purported signature of Mrs. Adler, the person named as grantor of the Purported Trust, contained in the Trust Agreement was a forgery.

### Application for the Adler Policy

32. On or about April 20, 2007[1], in furtherance of the STOLI scheme, an application for a $5 million life insurance policy insuring the life of Mrs. Adler, a resident of the state of Ohio, was submitted to AXA Equitable (the "Application"). A copy of the Application is attached to the Adler Policy, which was attached as Exhibit "C" to the Answer.

33. At the time the Application was submitted to AXA Equitable, but unknown to AXA Equitable, Mrs. Adler was a woman of limited means. Mrs. Adler had total assets of less than $100,000, had income composed mainly of Social Security benefits, and had previously applied for financial assistance from several providers of prescription medications, claiming an inability to pay for those medications not covered by Medicare.

34. The Application named as the intended owner and beneficiary of the Adler Policy the Purported Trust, with Rubenstein indicated as trustee. In the Application, Rubenstein identified himself as the attorney for Mrs. Adler. *See*, Exhibit "C" to the Answer, p. 27.

---

[1] The Application indicates that it was signed on April 20, 2006. However, this appears to be an oversight. As a result, the date of the Application should have been April 20, 2007.

35. The Application was signed by Rubenstein, as trustee of the Purported Trust. The Application was also signed by Winer, who was identified alternatively as a "financial professional" and "[a]gent." At least once, Winer signed the application as a witness to the purported signature of Mrs. Adler. *See,* Exhibit "C" to the Answer.

36. Mrs. Adler signed only Part 2 of the Application ("Part 2"), which related to a medical examination in University Heights, Ohio. Mrs. Adler signed Part 2 in University Heights, Ohio. Part 2 was the only portion of the Application that was required to be witnessed by someone other than Rubenstein or Winer.

37. Other than in Part 2, the signatures contained in the Application that purportedly belonged to Mrs. Adler neither indicate that they were signed by nor bear any resemblance to the handwriting of Judith Abrams, to whom Mrs. Adler had given a durable general power of attorney. These purported signatures of Mrs. Adler on the Agreement were not, in fact, signed by Judith Abrams. *See,* Exhibit "C" to the Answer, pp. 29, 30, 32-33, 35.

38. Other than in Part 2, in each of the instances where the Application was purportedly signed by Mrs. Adler, the signature of Mrs. Adler was a forgery. *See,* Exhibit "C" to the Answer, pp. 29, 30, 32-33, 35.

### Misrepresentations Regarding the Purpose of the Adler Policy

39. The Application submitted in support of the Adler Policy and signed by Rubenstein, Winer, and an as yet unidentified forger, contained at least two misrepresentations concerning the purpose of the Adler Policy.

40. Question G(1) in Section 2 of the Application asked whether the owner intended to use or transfer the policy for any type of pre-death financial settlement, such as a viatical

settlement, senior settlement, life settlement or any other secondary market transaction. The Application indicated "No" in answer to this question.

41. This representation is materially false because the true purpose of the procurement of the Adler Policy was to use it for a secondary market transaction or to transfer it into the secondary market.

42. Question number 14 of the Financial Supplement Forming Part of the Application for Life Insurance ("Financial Supplement") asked the applicant to state why the Adler Policy was being purchased. The Application indicated "Estate Protection" in response to this question.

43. This representation is materially false, both because the face amount of the Adler Policy was vastly greater than necessary for estate protection and because the actual purpose of the procurement of the Adler Policy was to use it for a secondary market transaction or to transfer it into the secondary market in furtherance of the STOLI scheme.

### Misrepresentations Regarding Other Insurance

44. The Application submitted in support of the Adler Policy contained at least one material misrepresentation concerning other insurance applied for on the life of Mrs. Adler.

45. Question H in Section 2 of the Application asked whether there was "[a]ny other life insurance now in effect or application now pending." The Application indicated that Mrs. Adler had one other "[a]pplication pending with Principal for same amount will take best offer."

46. This representation was materially false because, among other things, the participants in this STOLI scheme never intended to accept only one offer and, in fact, both AXA Equitable and Principal Life Insurance Company ("Principal") issued coverage on the life of Mrs. Adler. Principal issued a $5 million policy on the life of Mrs. Adler on May 10, 2007.

Additionally, this STOLI scheme involved a third $5 million policy issued on the life of Mrs. Adler which was issued by The John Hancock Life Insurance Company on May 22, 2007.

### Misrepresentations Regarding Mrs. Adler's Finances

47.     The Application submitted in support of the Adler Policy contained at least two material misrepresentations concerning Mrs. Adler's financial status.

48.     The response to Question P in Section 1 of the Application indicated that Mrs. Adler had a net worth of "12,000,000+." More specifically, in response to Question 1 of the Financial Supplement, the Application indicated that Mrs. Adler had $2,500,000 in liquid assets and $10,000,000 in real estate for a total net worth of $12,500,000.

49.     Question 2 of the Financial Supplement indicated that Mrs. Adler earned $1,500,000 per year in rental income and dividends and interest.

50.     The representations made on the Application as to Mrs. Adler's finances were materially false. In fact, Mrs. Adler's actual net worth was below $100,000 and her annual income consisted mostly of Social Security benefits in an amount far below $1,500,000.

51.     All of the misrepresentations in the Application were intended to and did conceal the true purpose of the procurement of the Adler Policy, which was to use it for a secondary market transaction or to transfer it into the secondary market in furtherance of the STOLI scheme. All of the misrepresentations in the Application were also intended to and did conceal a lack of insurable interest to support the policy.

### First Financial Underwriting Inspection

52.     In furtherance of the STOLI scheme and for the purpose of preventing AXA Equitable from uncovering their fraudulent activities, Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions

arranged for AXA Equitable to receive a report from First Financial Underwriting Services, Inc. ("First Financial") that contained materially false information regarding Mrs. Adler's financial situation (the "Inspection Report").

53.    In early 2007, as part of its underwriting of any high face amount life insurance policy (i.e., one with a death benefit of $2 million or more), AXA Equitable required submission of an underwriting inspection report to verify important matters such as the prospective insured's financial situation and medical condition.  The purpose for receiving such a report is to have an independent third party investigate these matters.

54.    After receiving the Application, AXA Equitable undertook an underwriting investigation.  As part of this investigation, AXA Equitable received the Inspection Report prepared by First Financial on or about May 1, 2007.  A copy of the Inspection Report was attached as Exhibit "D" to the Answer.

55.    The Inspection Report was prepared at the behest of Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions to conceal the true purpose for the Adler Policy and Mrs. Adler's true net worth and income.

56.    The Inspection Report indicated that the inspector who prepared it was Chuck McCann ("McCann").

57.    The Inspection Report contained several material inaccuracies; for example, it indicates that Mrs. Adler "owns substantial real estate from [a] divorce settlement," that Mrs. Adler had a personal residence worth $500,000, other real estate investments worth $9,500,000, and total assets in the amount of $13,000,000, and that the purpose of the policy was for estate

and financial planning purposes. In fact, Mrs. Adler's assets totaled less than $100,000 and her income consisted mainly of Social Security benefits.

58.     The Inspection Report also indicated that McCann had contacted Allan Goldstein, CPA, who was listed in the Inspection Report as Mrs. Adler's accountant and who, purportedly, confirmed her financial information.

59.     There is no such person as Allan Goldstein who was practicing at the relevant time as a CPA in Cleveland, Ohio. Mr. Goldstein is a complete fabrication.

60.     Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions, under the guise of Allan Goldstein and other fabrications, reported false information to McCann, who then included this information in the Inspection Report, upon which AXA Equitable reasonably relied in its underwriting of the Adler Policy.

### Issuance of the Adler Policy

61.     Based in part upon the Application and the supplements submitted in support thereof, which together form part of the Adler Policy, and in part upon the Inspection Report provided by First Financial, all of which AXA Equitable justifiably relied upon, the Application was approved for $5 million in coverage and the Adler Policy was issued with a policy date of May 11, 2007. At issuance, the owner and beneficiary of the Adler Policy was the Purported Trust.

62.     The insured under the Adler Policy was Ohio resident Mrs. Adler.

63.     On or about May 30, 2007, AXA Equitable received an initial premium payment of $326,540 via a check, signed by Rubenstein, across the top of which "Esther Adler Family

Trust" had been handwritten. Mrs. Adler was financially incapable of funding the Adler Policy and did not fund either the Purported Trust or the Adler Policy, directly or indirectly.

## Subsequent Transactions Involving the Adler Policy

*The Purported Trust Transfers Ownership of the Adler Policy to LSC*

64.    The Purported Trust entered into a "Purchase Agreement and Absolute Assignment of Life Insurance Policy," dated January 22, 2009, with Life Settlement Corporation ("LSC"), pursuant to which the Purported Trust transferred to LSC all of its right, title and interest in the Adler Policy in exchange for $700,000. A copy of the Purchase Agreement and Absolute Assignment of Life Insurance Policy was attached as Exhibit "E" to the Answer.

*LSC Transfers Ownership of the Adler Policy to the CSSEL Bare Trust*

65.    On February 6, 2009, the LSC submitted to AXA Equitable an Ownership Change Request Form and a Beneficiary Change Request Form, which indicated that the new owner and beneficiary of the Adler Policy was CSSEL Bare Trust dated April 21, 2006 ("CSSEL Bare Trust"), with Wells Fargo Delaware Trust Company as Trustee. Copies of these Change Request Forms were attached as Exhibit "F" to the Answer. AXA Equitable acknowledged receipt of these forms on February 26, 2009 and updated its records accordingly.

*LSC Reacquires Ownership of the Adler Policy and Submits a Death Claim*

66.    On June 5, 2009, Wells Fargo Delaware Trust Company, as trustee of the CSSEL Bare Trust, submitted to AXA Equitable an Ownership Change Request Form and a Beneficiary Change Request Form, which indicated that the new owner and beneficiary of the Adler Policy was LSC. Copies of these Change Request Forms were attached as Exhibit "G" to the Answer. AXA Equitable acknowledged receipt of these forms on June 11, 2009 and updated its records accordingly.

67.     On June 6, 2009, Mrs. Adler passed away.

68.     On July 15, 2009, LSC submitted a Claim to Life Insurance Benefits to AXA Equitable, naming LSC as the beneficiary under the Adler Policy. This Claim to Life Insurance benefits was attached as Exhibit "H" to the Answer.

*LSC Purportedly Transfers Ownership to its Affiliate, SF*

69.     On October 12, 2009, for the sole purpose of evading a lawsuit filed on September 3, 2009, in Ohio by AXA Equitable naming LSC as a defendant[2], executed an "Assignment of Death Benefit Proceeds" purporting to assign and transfer LSC's right and interest in the death benefit proceeds arising from the Adler Policy to SF.

70.     SF and LSC are affiliated companies, under common ownership. SF and LSC share the same Chief Executive Officer and share a mailing address at 3301 Quantum Blvd., 2nd Floor, Boynton Beach, Florida 33426.

71.     SF filed the Complaint against AXA Equitable on October 13, 2009, a single day after the purported assignment of interest in the death benefits from LSC to SF.

*Purported Trust's Efforts to Reclaim the Adler Policy After Mrs. Adler's Death*

72.     Meanwhile, LSC submitted to AXA Equitable an Ownership Change Request Form and a Beneficiary Change Request Form on June 11, 2009, several days after the death of Mrs. Adler, which indicated that the new owner and beneficiary of the Adler Policy was the Purported Trust. Copies of these Change Request Forms were attached as Exhibit "I" to the Answer.

---

[2] This lawsuit, *AXA Equitable Life Insurance Company v. Rubenstein*, Case No. CV-09-703178, was filed in the Court of Common Pleas of Cuyahoga County, Ohio (the "Ohio Action"). This lawsuit has since been dismissed for lack of personal jurisdiction over Rubenstein, a necessary and indispensable party.

73.     Rubenstein, as trustee of the Purported Trust, submitted a Claim to Life Insurance Benefits to AXA Equitable on July 6, 2009, naming the Purported Trust as the beneficiary under the Adler Policy.  This Claim to Life Insurance Benefits was attached as Exhibit "J" to the Answer.

74.     After receiving the competing claims to the death benefit, AXA Equitable learned of the STOLI scheme involved in procuring the Adler Policy and initiated the Ohio Action seeking a declaration that the Adler Policy is void *ab initio*.  As noted above, the Ohio Action was dismissed for lack of personal jurisdiction over Rubenstein and AXA Equitable is, thus, now pursuing relief in its Counterclaim and this Third-Party Complaint.

### Other Litigation Involving Policies on the Life of Mrs. Adler

75.     Life insurance policies procured on the life of Mrs. Adler have been and are the subject of several lawsuits, one of which is currently outstanding, and all of which help illustrate the depth and breadth of the STOLI scheme involved in the instant case.

76.     In *The John Hancock Life Insurance Company v. Chaim Citronenbaum, individually and in his capacity as Trustee of The Esther Adler 2007 Family Trust*, 09-CV-5497, S.D.N.Y., John Hancock Life Insurance Company sought a declaration that a policy procured in May 2007 upon the life of Esther Adler is void *ab initio* due to a lack of insurable interest and damages as a result of, among other things, John Hancock being defrauded, due to misrepresentations of Mrs. Adler's income and net worth and the source of premium payments for the policy.[3]  A copy of the John Hancock complaint was attached as Exhibit "K" to the Answer.

---

[3] The John Hancock complaint also seeks a declaration as to the enforceability of a mutual release entered into between John Hancock and the Trustee, Chaim Citronenbaum.  The Hancock action was resolved out of court and has therefore been dismissed.

77.     In *Principal Life Insurance Company v. Fifth Season Master Funding Series D LLC, Stone Financial Corp., Eli Deutsch and John Does 1-10,* 09-CV-1921, N.D. Ohio, Principal sought a declaration that a policy procured on the life of Esther Adler is void *ab initio* and damages as a result of, among other things, negligent misrepresentations made by the producer and trustee on the application and their intentional fraud inducing Principal into issuing a life insurance policy, by misrepresenting Mrs. Adler's income and net worth, the intent to sell the policy on the secondary market, and the amount of life insurance Mrs. Adler intended to accept. A copy of the Principal Complaint was attached as Exhibit "L" to the Answer.[4]

78.     The Adler Policy issued by AXA Equitable contained misrepresentations similar to the Hancock and Principal policies, and Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions, upon information and belief, used the same scheme to procure the Adler Policy that was used to defraud Hancock and Principal.

79.     As a result of issuing the Adler Policy, AXA Equitable has sustained substantial damages in the form of commissions paid and expenses related to the Adler Policy.

## COUNT I

## DECLARATORY JUDGMENT – INVALIDITY OF THE PURPORTED TRUST

80.     AXA Equitable hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

81.     The Trust Agreement purported to form the Purported Trust under New York's Estates, Powers and Trusts Law. *See*, Article Thirteen, Section A of Exhibit "B" to the Answer.

---

[4] The Principal case has since been, by stipulation of the parties involved, transferred to the Southern District of Florida and opened as case 10-cv-20593, filed on February 26, 2010.

82.     The Purported Trust, as purportedly established by the Trust Agreement, constituted a "lifetime trust" within the meaning of New York's Estates, Powers and Trusts Law § 1-2.20.

83.     New York's Estates, Powers and Trusts Law § 7-1.17 provides that "every lifetime trust shall be in writing and shall be executed and acknowledged by the initial creator …".

84.     On the date the Trust Agreement was purported signed by Mrs. Adler in New York, Mrs. Adler was actually in Cleveland, Ohio. Thus, she did not sign the Trust Agreement in New York on March 2, 2007.

85.     In fact, Mrs. Adler never signed the Trust Agreement.

86.     The signature purported to be that of Mrs. Adler in the Trust Agreement neither indicates that it was signed by nor bears any resemblance to the handwriting of Judith Abrams, to whom Mrs. Adler had given a durable general power of attorney.

87.     The purported signature of Mrs. Adler on the Trust Agreement was not, in fact, signed by Judith Abrams.

88.     The signature purported to be that of Mrs. Adler, the purported creator of the Purported Trust, is not genuine and is, in fact, a forgery.

89.     Because Mrs. Adler never executed the Trust Agreement, the Purported Trust was never validly formed.

90.     As the Purported Trust was never validly formed, it was incapable as a matter of law of owning or being the beneficiary under the Adler Policy.

91.    Because a policy of life insurance cannot be issued without an owner or

beneficiary, AXA Equitable is entitled to a judicial declaration that the Adler Policy is void *ab*

*initio.*

## COUNT II

### DECLARATORY JUDGMENT – INSURABLE INTEREST

92.    AXA Equitable hereby incorporates by reference each and every averment

contained in the preceding paragraphs as if set forth herein at length.

93.    Upon information and belief, the Adler Policy was issued to, at the behest of,

and/or in accordance with a STOLI scheme initiated by Rubenstein, Winer, an as yet unidentified

forger, and/or other persons or entities engaged in secondary life insurance market transactions

that had as its purpose furthering and concealing the fraud perpetrated in order to induce AXA

Equitable into issuing the Adler Policy with the plan and intent to profit from the fraud by

transferring the Adler Policy into the secondary market.

94.    Mrs. Adler was a senior citizen of modest financial means, who was living

primarily off of Social Security, with assets totaling less than $100,000. Upon information and

belief, Mrs. Adler therefore did not seek, and had no need for, a $5 million life insurance policy.

95.    Mrs. Adler was financially incapable of funding the Adler Policy and, upon

information and belief, did not fund the Purported Trust and/or make the premium payments to

sustain the Adler Policy, either directly or indirectly.

96.    Upon information and belief, Mrs. Adler did not consent to the issuance of a $5

million life insurance policy on her life.

97.     In each of the instances where the Application was purportedly signed by Mrs. Adler, the signature was not the genuine signature of Mrs. Adler, save for the signature contained in Part 2, which related to a medical examination of Mrs. Adler.

98.     Other than in Part 2, the signatures of Mrs. Adler in the Application and the signature of Mrs. Adler in the Purported Trust documents, including the Trust Agreement, neither indicate that they were signed by nor bear any resemblance to the handwriting of Judith Abrams, to whom Mrs. Adler had given a durable general power of attorney.

99.     In fact, these signatures were not signed by Judith Abrams.

100.    Mrs. Adler's signature was forged in at least five places in the Application.

101.    Mrs. Adler's signature was forged in the Purported Trust documents, including the Trust Agreement.

102.    Upon information and belief, the Adler Policy was procured to gamble on the life of Mrs. Adler and to benefit strangers in the event of Mrs. Adler's death.

103.    As such, AXA Equitable is entitled to a judicial declaration that the Adler Policy lacked an insurable interest and is therefore void *ab initio*.

### COUNT III

### FRAUD

104.    AXA Equitable hereby incorporates by reference each and every averment of fact contained in the preceding paragraph as if set forth herein at length.

105.    Rubenstein made the following false representations on the Application:

a.      The owner of the Adler Policy did not intend to use or transfer the policy for a secondary market transaction, and that the purpose for the procurement of the Adler Policy was "Estate Protection." Upon information and belief, for reasons set forth more

fully above, the true purpose for the procurement of the policy was to use it for a secondary market transaction or to transfer it on the secondary market.

      b.      There was only one other life insurance application on the life of Mrs. Adler pending and that the policy owner would accept the better offer. Upon information and belief, the participants in this STOLI scheme never intended to accept only one offer and, in fact, both AXA Equitable and Principal issued coverage on the life of Mrs. Adler. Additionally, this STOLI scheme involved a third $5 million policy issued on the life of Mrs. Adler which was issued by The John Hancock Life Insurance Company on May 22, 2007.

      c.      Mrs. Adler had a net worth of over $12,000,000, including $2,500,000 in liquid assets and $10,000,000 in real estate holdings, and that Mrs. Adler earned $1,500,000 per year in rental income and dividends and interest. Mrs. Adler's net worth was below $100,000 and her annual income consisted primarily of Social Security benefits in an amount far below $1,500,000 per year.

106.   Rubenstein made these misrepresentations with knowledge of their falsity and/or with utter disregard and recklessness as to whether the representations were true or false.

107.   These misrepresentations were material to AXA Equitable's decision to issue the Adler Policy and were made for the purpose of inducing AXA Equitable into issuing the Adler Policy. Had AXA Equitable known the truth behind any of these misrepresentations, AXA Equitable would not have issued the Adler Policy.

108.   AXA Equitable justifiably relied upon these misrepresentations in issuing the Adler Policy. In fact, by signing the Application, Rubenstein, as trustee of the Purported Trust, agreed that "[t]he statements and answers in all parts of this application are true and complete.

- 21 -

We [AXA Equitable] may rely on them in acting on this application." *See*, Exhibit "C" to the Answer, p. 28.

109.   AXA Equitable has incurred substantial costs and damages as a result of these wrongful misrepresentations, in an amount to be proven at trial, consisting of, among other things, commissions, costs and expenses associated with the issuance of the Adler Policy. Further, if the Court were to find that SF, or any other person or entity, is entitled to receipt of payment of the death benefit under the Adler Policy, such payment would constitute additional damages suffered by AXA Equitable.

**COUNT IV**

**CONSPIRACY TO COMMIT FRAUD**

110.   AXA Equitable hereby incorporates by reference each and every averment of fact contained in the preceding paragraph as if set forth herein at length.

111.   Upon information and belief, Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions engaged in a common scheme designed to allow these persons or entities to speculate on and profit from the death of the late Mrs. Adler by perpetrating a fraud for the purpose of inducing AXA Equitable to issue the Adler Policy.  In particular and without limitation, the acts in furtherance of the common scheme included the acts alleged in each of the following paragraphs of this Third-Party Complaint: 22-24 and 31 (as to the purported establishment of the Purported Trust by use of the forged signature of Mrs. Adler); 32, 34, 38-40, 42, 44-45 and 47-49 (as to the fraudulent submission of the Application to AXA Equitable containing material misrepresentations, the making of said misrepresentations on the Application, and the forgery of Mrs. Adler's signature on the Application); and 52, 55 and 60 (as to the arranging for the

- 22 -

provision of the Inspection Report to AXA Equitable, to the impersonation of Allan Goldstein and others and to the provision of materially incorrect information to McCann).

112.    Upon information and belief, every action taken in furtherance of this scheme by either Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions had as its purpose furthering and concealing the fraud perpetrated in order to induce AXA Equitable into issuing the Adler Policy with the plan and intent to profit from the fraud by transferring the Adler Policy into the secondary market.

113.    AXA Equitable has incurred substantial costs and damages as a result of this conspiracy, in an amount to be proven at trial, consisting of, among other things, commissions, costs and expenses associated with the issuance of the Adler Policy.  Further, if the Court were to find that SF, or any other person or entity, is entitled to receipt of payment of the death benefit under the Adler Policy, such payment would constitute additional damages suffered by AXA Equitable.

## COUNT V

## NEGLIGENT MISREPRESENTATION

114.    AXA Equitable hereby incorporates by reference each and every averment of fact contained in the preceding paragraph as if set forth herein at length.

115.    Rubenstein, as trustee of the Purported Trust, had a pecuniary interest in the procurement of the Adler Policy, as the Purported Trust was named in the Application as the initial owner and beneficiary of the Adler Policy.

116.    All representations in the Application were made in the course of business, in that the purpose of the Application was the procurement of the Adler Policy from AXA Equitable.

- 23 -

The representations included in the Application were to be used in assessing whether the issuance of the Adler Policy was appropriate.

117.   Rubenstein made the following false representations on the Application:

a.      The owner of the Adler Policy did not intend to use or transfer the policy for a secondary market transaction, and that the purpose for the procurement of the Adler Policy was "Estate Protection." Upon information and belief, for reasons set forth more fully above, the true purpose for the procurement of the policy was to use it for a secondary market transaction or to transfer it on the secondary market.

b.      There was only one other life insurance application on the life of Mrs. Adler pending and that the policy owner would accept the better offer. Upon information and belief, the participants in this STOLI scheme never intended to accept only one offer and, in fact, both AXA Equitable and Principal issued coverage on the life of Mrs. Adler. Additionally, this STOLI scheme involved a third $5 million policy issued on the life of Mrs. Adler which was issued by The John Hancock Life Insurance Company on May 22, 2007.

c.      Mrs. Adler had a net worth of over $12,000,000, including $2,500,000 in liquid assets and $10,000,000 in real estate holdings, and that Mrs. Adler earned $1,500,000 per year in rental income and dividends and interest. Mrs. Adler's net worth was below $100,000 and her annual income consisted primarily of Social Security benefits in an amount far below $1,500,000 per year.

118.   Rubenstein knew or should have known that the representations described in the preceding paragraphs were false, and thus failed to exercise reasonable care or competence in supplying correct information.

119. These misrepresentations were material to AXA Equitable's decision to issue the Adler Policy. Had AXA Equitable known the truth concealed by these misrepresentations, AXA Equitable would not have issued the Adler Policy.

120. AXA Equitable justifiably relied upon these misrepresentations in issuing the Adler Policy. In fact, by signing the Application, Rubenstein, as trustee of the Purported Trust, agreed that "[t]he statements and answers in all parts of this application are true and complete. We [AXA Equitable] may rely on them in acting on this application." *See*, Exhibit "C" to the Answer, p. 28.

121. AXA Equitable has incurred substantial costs and damages as a result of these wrongful misrepresentations, in an amount to be proven at trial, consisting of, among other things, commissions, costs and expenses associated with the issuance of the Adler Policy. Further, if the Court were to find that SF, or any other person or entity, is entitled to receipt of payment of the death benefit under the Adler Policy, such payment would constitute additional damages suffered by AXA Equitable.

## COUNT VI

### VIOLATION OF OHIO'S VIATICAL SETTLEMENTS ACT

122. AXA Equitable hereby incorporates by reference each and every averment of fact contained in the preceding paragraph as if set forth herein at length.

123. Pursuant to O.R.C. § 3916.16, it is a violation of the Ohio Act to enter into a viatical settlement contract within a five-year period commencing with the date of issuance of the policy.

124.   Pursuant to O.R.C. § 3916.01, this limitation applies to any life insurance policy "affecting the rights of a resident of [Ohio] or bearing a reasonable relation to [Ohio]," regardless of whether the policy is delivered or issued for delivery in Ohio.

125.   The Adler Policy was issued on the life of Ohio resident Mrs. Adler and thus affects the rights of a Ohio resident and/or bears a reasonable relation to Ohio.

126.   The Adler Policy had an issue date of May 11, 2007.

127.   Rubenstein, as trustee of the Purported Trust, entered into a "Purchase Agreement and Absolute Assignment of Life Insurance Policy" with LSC, whereby the Purported Trust transferred to LSC all of its rights, title and interest in the Adler Policy, on January 22, 2009, less than two years after the issue date.

128.   Pursuant to O.R.C. § 3916.171(B)(4), it is a violation of the Ohio Act to recklessly enter into, negotiate, broker, or otherwise deal in a viatical settlement contract involving a policy that was obtained by presenting false, deceptive, or misleading information of any fact material to the policy, for the purpose of misleading and with the intent to defraud the issuer of the policy.

129.   Rubenstein, as trustee of the Purported Trust, had previous knowledge of the fraudulent misrepresentations made by Rubenstein himself, Winer, and the as yet unidentified forger who forged the signature of Mrs. Adler on the Application to AXA Equitable in the course of applying for the Adler Policy. Nevertheless, Rubenstein, as Trustee of the Purported Trust, entered into a "viatical settlement contract" (as defined under the Ohio Act) with LSC, as described above, in reckless disregard of this knowledge.

130.    Pursuant to O.R.C. § 3916.21, any person who fails to comply with any provision of the Ohio Act has engaged in unfair and deceptive acts or practices in the business of insurance under O.R.C. §§ 3901.19 to 3901.26.

131.    By entering into the viatical settlement contract described above, Rubenstein has violated Sections 3916.16 and 3916.171(B)(4) of the Ohio Act and has thus committed unlawful, unfair and deceptive trade practices.

132.    As a result of the unlawful conduct of Rubenstein and his violations of Sections 3916.16 and 3916.171(B)(4) of the Ohio Act, AXA Equitable has suffered injury in an amount to be proven at trial.

### COUNT VII

### CONSPIRACY TO VIOLATE OHIO'S VIATICAL SETTLEMENTS ACT

133.    AXA Equitable hereby incorporates by reference each and every averment of fact contained in the preceding paragraph as if set forth herein at length.

134.    Upon information and belief, Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions engaged in a common scheme designed to allow these persons or entities to speculate on and profit from the death of the late Mrs. Adler by perpetrating a fraud for the purpose of inducing AXA Equitable to issue the Adler Policy and by subsequently transferring the fraudulently obtained policy into the secondary market by entering into a life settlement contract.  In particular and without limitation, the acts in furtherance of the common scheme included the acts alleged in each of the following paragraphs of this Third-Party Complaint: 22-24 and 31 (as to the purported establishment of the Purported Trust by use of the forged signature of Mrs. Adler); 32, 34, 38-40, 42, 44-45 and 47-49 (as to the fraudulent submission of the Application to AXA

Equitable containing material misrepresentations, the making of said misrepresentations on the Application, and the forgery of Mrs. Adler's signature on the Application); 52, 55 and 60 (as to the arranging for the provision of the Inspection Report to AXA Equitable, to the impersonation of Allan Goldstein and others and to the provision of materially incorrect information to McCann); and 64 (as to the entry into a life settlement contract with LSC).

135.    Upon information and belief, every action taken in furtherance of this scheme by either Rubenstein, Winer, an as yet unidentified forger, and/or other persons or entities engaged in secondary life insurance market transactions had as its purpose furthering and concealing the fraud perpetrated in order to induce AXA Equitable into issuing the Adler Policy with the plan and intent to profit from the fraud by transferring the Adler Policy into the secondary market.

136.    As set forth in Count VI herein, the entry into a life settlement contract by Rubenstein, as trustee of the Purported Trust, was a violation of the Ohio Act pursuant to O.R.C. § 3916.171(B)(4).

137.    As set forth in Count VI herein, the violation of the Ohio Act in considered an unfair and deceptive trade practice pursuant to O.R.C. § 3916.21.

138.    As a result of this conspiracy to violate the Ohio Act, AXA Equitable has suffered injury in an amount to be proven at trial.

## RELIEF REQUESTED

WHEREFORE, AXA Equitable respectfully requests a trial by jury of all issues so triable and a judgment in its favor by this Court as follows:

A.    A declaration that the Adler Policy is void *ab initio* due to the invalidity of the Purported Trust and, thus, the failure of the purported owner of the Adler Policy ever to come into existence;

B.      A declaration that the Adler Policy is void *ab initio* due to a lack of insurable interest at the inception of the Adler Policy;

C.      A declaration that, because the Adler Policy is void *ab initio*, no death benefit is payable thereunder;

D.      A declaration that, due to the fraudulent procurement of the Adler Policy, AXA Equitable may retain the premiums paid for the Adler Policy;

E.      An award to AXA Equitable of compensatory damages as permitted by law, including but not limited to Ohio's Viatical Settlements Act;

F.      An award of punitive damages as permitted by law, including but not limited to Ohio's Viatical Settlements Act;

G.      An award of AXA Equitable's attorneys' fees and costs, as determined by the Court; and

H.      An award of such further relief as this Court deems appropriate.

Respectfully submitted,

Dated: April 26, 2010

DRINKER BIDDLE & REATH LLP

By: _____
Stephen A. Serfass (*pro hac vice*)
Stephen C. Baker (*pro hac vice*)
Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103
(215) 988-2700 (phone)
(215) 988-2757 (facsimile)
Stephen.Serfass@dbr.com
Stephen.Baker@dbr.com

## CERTIFICATE OF SERVICE

This is to certify that I have on this date served, on the parties or counsel of record listed below, a copy of the foregoing Third-Party Complaint by sending it via overnight Federal Express to the addresses listed below:

Philip H. Cohen
Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166

Ina M. Berlingeri
Greenberg Traurig, LLP
401 East Las Olas Boulevard
20th Floor
Fort Lauderdale, FL 33301
*Attorneys for Plaintiff Settlement Funding*

*Of Counsel*
Jesus E. Cuza
Greenberg Traurig, LLP
200 Park Avenue
New York, New York 10166

Life Settlement Corporation
3720 DaVinci Court
Suite 450A
Norcross, GA 30092
*Counterclaim-Defendant*

Dated: April 26, 2010

Stephen A. Serfass