UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
SETTLEMENT FUNDING, LLC                          :
                                                 :
    Plaintiff - Counterclaim Defendant,          :
                                                 :   09 CV 8685 (HB)
    - against -                                  :
                                                 :   OPINION &
AXA EQUITABLE LIFE INSURANCE CO.                 :   ORDER
                                                 :
    Defendant - Counterclaim Plaintiff –         :
    Third-Party Plaintiff,                       :
                                                 :
    - against -                                  :
                                                 :
LIFE SETTLEMENT CORPORATION                      :
                                                 :
    Counterclaim Defendant,                      :
                                                 :
    - and -                                      :
                                                 :
ALAN RUBENSTEIN                                  :
                                                 :
    Third-Party Defendant.                       :
----------------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-30-10

**Hon. Harold Baer, Jr., District Judge:**

    Plaintiff Settlement Funding LLC ("Settlement Funding" or "Plaintiff") is the assignee of a life insurance policy and demands payment based on the death of the insured, non-party Esther Adler. Defendant AXA Equitable Life Insurance Company ("Defendant" or "AXA") is the issuer of the policy and claims that the policy is void *ab initio* due to infirmities in its creation. Settlement Funding and counterclaim defendant Life Settlement Corporation ("LSC" or, together with Settlement Funding, "SF"), counter that AXA may not contest the validity of the insurance policy because it bargained away that right pursuant to an "incontestability clause," which prohibits challenges to the validity of the policy after it has been in force for two years.

    SF presents the case as a straightforward dispute between a legitimate policy holder and an insurer seeking to avoid a liability. AXA paints a more ambiguous picture. According to AXA, the policy was one of three procured on Adler's life through outright fraud in the context of what is known as stranger originated life insurance ("STOLI"), a scheme that uses an

1

unwitting and elderly person such as the insured here, Mrs. Adler, as the instrumentality of the fraud. AXA claims that the three policies comprised a common scheme that defrauded AXA and others and gave rise to multiple lawsuits in various other courts between various parties.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 11, 2007, AXA approved and issued a $5 million life insurance policy (the "Policy") to the "Esther Adler Trust" (the "Trust"). The Policy was applied for by Eli A. Rubenstein (referred to as "Alan Rubenstein"), the trustee of the Trust, and insured the life of Mrs. Adler, who at the time of issuance was a resident of Ohio. The Trust beneficiaries included Mrs. Adler's two daughters, Judith Abrams and Zeva Citronenbaum, as well as Chaim Citronenbaum, Adler's son-in-law.

According to Defendant, and not directly denied by Plaintiffs, this Policy was obtained through fraud. While the Policy application claimed Adler had a net worth in excess of $12 million, she in fact lived in an apartment in Ohio and had assets of less than $100,000. Moreover, AXA has submitted evidence suggesting that an unidentified individual assumed a false identity, represented himself as Mrs. Adler's accountant, and confirmed as true the misstatements made on the Policy application during AXA's underwriting process prior to AXA's issuance of the Policy.

In addition to this, AXA presents evidence that Mrs. Adler's signature was forged on the Trust Agreement, specifically that Mrs. Adler was in Ohio at the time the Trust Agreement was signed in New York, and the notary that allegedly took her signature affirmed that he has never met Mrs. Adler, never notarized her signature, and did not notarize the Trust (suggesting that his signature, too, was forged).

Two additional $5 million policies insuring Mrs. Adler's life were taken out, one with John Hancock Life Insurance Company, naming Chaim Citronenbaum as trustee, and one with Principal Life Insurance Company, naming Alan Rubenstein as Trustee.

Contradicting a statement on the application to the effect that the Policy would not be transferred for settlement or on a secondary market, Rubenstein on behalf of the Adler Trust transferred the Policy to Life Settlement Corporation ("LSC") on January 27, 2009, for $750,000. The Policy was next sold for over $1 million, this time to a Credit Suisse affiliate called CSSEL Bare Trust, pursuant to a master purchase agreement. However, CSSEL quickly demanded that the sale be unwound due to its determination that the policy lacked an insurable

interest. LSC then negotiated with the Adler Trust to repurchase the policy for $1,000,075, which represented the original purchase price plus a premium payment made by CSSEL while it owned the policy. The Adler Trust paid LSC to unwind the sale on June 8, 2009.

On June 6, 2009, Mrs. Adler passed away. On July 6, 2009, having learned of Mrs. Adler's death, Rubenstein submitted claim forms to AXA for the insurance proceeds and on July 15, 2009 LSC did the same.

A flurry of litigation ensued. In June and August of 2009, Hancock and Principal sued, in New York and Ohio respectively, to declare the Adler policies to be invalid. In July 2009, LSC sued Rubenstein in a Florida federal court for a declaration of entitlement to the benefits on the AXA Policy. In September 2009, AXA brought suit in Ohio state court against LSC and Rubenstein to declare its Policy invalid. One month after the commencement of the Ohio state action, LSC transferred the Policy yet again, this time to Settlement Funding, a sister company of LSC that operates out of the same principal place of business and has the same parent corporation. The very next day, October 13, 2009, SF commenced this suit. The Ohio action has since been dismissed.

On March 16, 2010 there was oral argument on Defendant's motion to dismiss and Plaintiff's previous motion for summary judgment. The motion to dismiss was withdrawn, and the motion for summary judgment was denied. On June 8, 2010 Settlement Funding filed an amended complaint adding a number of fraud-related claims. Now SF moves for summary judgment (1) granting its claim for recovery of insurance proceeds (Count I); (2) granting its claim for breach of contract (Count II); (3) dismissing AXA's claims for declaratory judgment (Counterclaims Counts I and II); and (4) dismissing AXA's claim for liability under the Ohio Act (Counterclaim Count III). AXA cross moves for summary judgment (1) declaring the policy void *ab initio* (Counterclaim Counts I and II); (2) declaring that Ohio law applies to its insurable interest claims under Counterclaim Count II; (3) dismissing Settlement Funding's claims for breach of contract and bad faith denial of coverage (Counts II and VI); (4) dismissing Settlement Funding's claims for negligent misrepresentation, common law fraud, and Tort Action under Ohio Law (Counts III, V and VII); (5) denying Settlement Funding's request for punitive damages on certain claims; and (6) dismissing Settlement Funding's claim for deceptive business practices pursuant to Section 349 of the New York Gen. Bus. Law (Count IV). For the reasons that follow, the cross motions are denied in part and granted in part.

DISCUSSION

### I. Legal standard

A federal court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The inquiry ... is ... whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Summary judgment is warranted if the moving party shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009); *see also* Fed.R.Civ.P. 56(c). A material fact is one that will affect the outcome of the suit, and a dispute about a material fact occurs where there is sufficient evidence for a reasonable fact finder to return a verdict for the nonmoving party. *See, e.g., Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Evidence must be viewed in a light most favorable to the non-moving party, and all inferences must be drawn in their favor. *See Cordiano*, 575 F.3d at 204. A party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Sista*, 445 F.3d at 169; Fed.R.Civ.P. 56(e).

### II. Validity of the Policy

The threshold issue before the Court is whether AXA may, despite the incontestability clause, challenge the validity of the Policy based on infirmities at inception. SF argues that the incontestability clause precludes all challenges and AXA must pay the death benefits. AXA responds that the policy is subject to challenge despite the incontestability clause, citing two independent reasons. First, since formation of the Adler Trust failed to conform to EPTL 7-1.17(a), New York's strict procedure for the creation of lifetime trusts, it never attained legal existence, and was therefore incompetent to enter into this or any other insurance policy contract. The policy is accordingly void *ab initio*, and as such the incontestability clause is of no fotrce or effect. Second, AXA argues that the Policy was created as part of an unlawful STOLI scheme, that its true owner at the time of issuance was a stranger to Esther Adler, and therefore lacked any insurable interest in her life, and this violates N.Y. Ins. Law § 3025(b)(2). For this

4

independent reason, argues AXA, the Policy is *void ab initio*. SF disputes many of the facts supporting these claims, but asserts in the first instance that such facts are immaterial because AXA is legally barred from contesting the validity of the Policy. Accordingly, the first question before the Court is whether such facts raise a material issue and summary judgment must be denied.

### A. The incontestability clause

New York requires that any policy for life insurance contain an incontestability clause. The typical life insurance policy "shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue." N.Y. Ins. Law § 3203(a)(3). This imposes a stringent bar on actions on the policy after the contestability period has come and gone. Courts must often preclude challenges even when based on a lack of insurable interest. *See New England Mut. Life. Ins. Co. v. Caruso*, 73 N.Y.2d 74, 79 (1989). In *Caruso* the Court of Appeals went further and suggested in *dicta* that the incontestability clause even bars challenges to policies issued on the basis of fraudulent misrepresentations. *Id.* at 76. Indeed, New York cases have held that once the incontestability clause has been met the issuer is precluded from challenge or at least from a successful challenge even where the insured failed to disclose material facts on an insurance application. *See, e..g., Ilyaich v. Bankers Life Ins. Co. of New York*, 849 A.D.3d 614, 615 (2d Dept. 2008) (granting summary judgment to defendant insurer despite misrepresentations made in the policy application). S*ee also Kramer v. Lockwood Pension Serv., Inc.*, 653 F.Supp.2d 354, 376-78 (S.D.N.Y. 2009) ("Courts applying New York law have held insurance carriers to the language of their incontestability clauses."). As courts have long recognized, the incontestability clause serves the important function of encouraging buyers to purchase insurance with confidence that after the contestable period has passed they are assured of receiving benefits for which they pay premiums, and strict adherence to such clauses serves the public policy interest in allowing parties to contract as they see fit. *Caruso*, 73 N.Y.2d at 82-83.

Though a high bar, the incontestability clause is not sacrosanct. The New York State Insurance Department's opinion provides that while all policies must, consistent with New York Insurance Law, contain an incontestability provision, "whether or not an individual life insurance policy is incontestable after being in force during the life of the insured for a period of two years

5

from its date of issue depends on the facts." Opinion of Office of General Counsel No. 02-02-04 (February 6, 2002). While such an opinion does not carry the force of law, "courts will uphold the interpretations of an agency charged with administration of a statute if the interpretations are not unreasonable or irrational." *Life Product Clearing LLC v. Angel*, 530 F.Supp.2d 626, 655 (S.D.N.Y. 2008) (Chin, J.) (*citing Kurcsics v. Merchants Mut. Ins. Co.*, 49 N.Y.2d 451, 426 (1980).

Even *Caruso* suggests that policies outside the contestability period may be subject to attack. In that case the Court of Appeals engaged in a thorough analysis to determine whether either the statutory scheme or public policy interests make policies acquired by one lacking an insurable interest void *ab initio*, or otherwise "foreclose[] the application of an incontestable clause to bar an insurer's disclaimer of liability." *Caruso*, 73 N.Y.2d at 80-81. While the Court's answer to both questions was no, the fact of its detailed analysis suggests that there may be situations, other than those involving a mere lack of insurable interest, where it is appropriate to evaluate an insurer's claim that a policy is void *ab initio*, notwithstanding the existence of an otherwise applicable incontestability clause.

Courts have held in limited instances that if the facts surrounding the creation and issuance of an insurance policy fail to demonstrate that a proper contract was entered into, then the incontestability clause will not preclude a challenge by the insurer. *See American Mayflower Life Ins. Co. of New York v. Moskowitz*, 17 A.D.3d 289, 794 N.Y.S.2d 32 (1st Dept. 2005) (holding that if there is a forged signature to transfer ownership of a life insurance policy to a stranger, "the incontestability clause could not apply, since the provisions for incontestability inure to the benefit of the insured and his beneficiary, or to the benefit of a bona fide assignee, but not a stranger"); *Provident Life and Casualty Insurance Co. v. Ginther*, No. 96 CV 0315E (SC), 2002 WL 1020775, * 7 (W.D.N.Y. March 4, 2002). Several recent out-of-state decisions are generally in accord.[1]

---

[1] *See Fioretti v. Massachusetts General Life Ins. Co.*, 53 F.3d 1228 ( 11th Cir. 1995) (Under New Jersey law, insurer was entitled to rescind life insurance contract, even after expiration of incontestability period, where applicant knowingly misrepresented his or her HIV-positive status as well as other health related information in both final policy application and "Statement of Good Health"); *Protective Life Ins. v. Sullivan*, 892 F. Supp. 299 (D. Mass. 1995) (under Massachusetts law, there is implicit exception to statutorily required incontestability clause for actual, willful fraud); *Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190 (1994) (statutorily required incontestability clause should not be interpreted to override the effect of fraudulent misrepresentations made by insureds in their policy applications, rather it was intended to protect those insureds who were unaware of their disease at the time of application); *Sciranko v. Fidelity & Guar. Life Ins. Co.*, 503 F. Supp. 2d 1293 (D. Ariz. 2007) (Under Arizona law, as predicted by the district court, insurer may deny claim after two year incontestability period on basis of fraudulent

6

Additionally, the statutory scheme of New York Insurance Law reveals that incontestability clauses in life insurance policies are less revered than are incontestability clauses in disability or health insurance policies. *See Magee v. Paul Revere Life Insurance Company*, 172 F.R.D. 647, 652-53 (E.D.N.Y. 1997). The difference derives from the fact that section 3216 of New York's Insurance Law, which governs health and disability insurance policies, expressly allows insurers to include an exception for fraud in their incontestability clauses. Issuers of such policies who opt not to include a fraud exception in their incontestability clause are more appropriately barred on an absolute basis from claiming invalidity due to fraud. *Id.*

Life insurance policies are different. Section 3203(a)(3) does not provide issuers of life insurance policies this express statutory invitation to carve out a fraud exception. The Court of Appeals articulated the importance of this distinction in *New England Mut. Life. Ins. Co. v. Doe*, 93 N.Y.2d 122, 129 (1999). While ultimately applying the clause to bar an insurer from challenging a disability insurance policy based on material omissions in the application, the Court suggested that, had it been faced with the same situation under a life insurance policy, it would have come out differently:

> Were we faced with a choice between fraud and statutory design, a far more difficult case would be presented. It would be difficult for us to conclude that the Legislature knowingly enacted a statute that would encourage fraud. But that is not the case. A carrier may, compatibly with the incontestability clause, protect itself by including a provision in its incontestability clause creating an exception for "fraudulent misstatements" (see, Insurance Law § 3216(d)(1)(B)) . . . The carrier here purposely chose not to include a fraud exception and is bound by that choice—a calculation that includes marketing inducements."

93 N.Y.2d 122. The Court thus implicitly recognized that, without an incontestability clause that allows fraud-based challenges beyond the two year period, construing the statutory requirement as an absolute ban on fraud-based challenges risks encouraging fraud. Put another way, if bad actors can disguise their fraud for two years, their hands are washed clean by the Legislative requirement of section 3203, and they are free to collect on their ill-gotten gains.

Finally, the interests balanced by the *Caruso* court twenty-plus years ago carry different weights today. Life insurance policies in which the beneficiary lacks an insurable interest,

---

misstatement in application, even if misstatement concerns insured's preexisting conditions and policy language does not affirmatively preserve insurer's right to deny claims on basis of fraud.)

whether termed "wager" insurance policies or "STOLI" schemes, have long been a problem. *See Warnock v. Davis,* 104 U.S. 775, 779 (1881); *Grigsby v. Russell,* 222 U.S. 149, 154-55 (1911). And while the importance of incontestability clauses has ostensibly remained constant, the concern over abuses involving life insurance policies lacking an insurable interest has occasioned two opinions from the New York State Insurance Department in the last ten years alone. *See* Opinion of Office of General Counsel No. 08-11-08 (November 26, 2008) (procurement of insurance solely as a speculative investment for the ultimate benefit of a disinterested third party is "contrary to the long established public policy against 'gaming' through life insurance purchase"); Opinion of Office of General Counsel No. 05-12-15 (December 19, 2005) (same). This indicates that the need to monitor and quell what appears to be an expanding market for STOLI policies tips the scales in favor of reviewing otherwise incontestable life insurance policies where, as here, a substantial factual record points to the existence of an improperly procured policy.

In light of the above, it is appropriate in this case to examine whether AXA has put sufficient facts in issue to justify review of the Policy notwithstanding the incontestability clause, and, if so, whether those facts preclude a finding that the Policy is valid as a matter of law.

### B. Improper formation of the Trust

The formation of the Trust, AXA alleges, failed to conform to the requirements of EPTL 7-1.17(a), which provides the sole means for creation of a trust in New York. Absent proper creation, its argument goes, the Trust had no ability to enter into the contract for the Policy, and the Policy therefore never came into existence.

EPTL 7-1.17(a) provides that "[e]very lifetime trust shall be in writing and shall be executed and acknowledged by the person establishing such trust and, unless such person is the sole trustee, by at least one trustee thereof." 2010 Sess. Law News of N.Y. Ch. 451 (A. 11316). These strict requirements were imposed in 1997 in recognition that adherence to formality "reduces substantially the potential for foul play." *Fasano v. DiGiacomo,* 49 A.D.3d 683, 685 (2d Dept. 2008) (*quoting* Senate Introducer Mem. in Support, Bill Jacket, L. 1997, ch. 139, at 8). If the formalities are not observed, a valid trust is not formed, and subsequent transactions entered into by the invalid trust may be declared null and void. *See Fasano,* 49 A.D.3d at 685.

8

Proper execution in this case would have required the validly notarized signatures of both Mrs. Adler, as the person establishing the trust, and Mr. Rubenstein, as the Trustee. *See* Decl. of Robert T. Rigal in Supp. of Settlement Funding, LLC's and Life Settlement Corporation's Mot. for Partial Summ. J. ("Rigal Decl."), Ex. 3. And indeed the Trust agreement contains marks purporting to be their signatures, dated March 2, 2007, Nassau County, New York. *Id.* However, AXA has mustered a number of facts indicating that Mrs. Adler's purported signature on the Trust Agreement is a forgery. In particular, Avi Kestenbaum, whose purported signature and notary stamp notarize the signatures on the Trust Agreement, never met Mrs. Adler, and never notarized her signature. Affidavit of Avi Z. Kestenbaum, Ex. A ¶ 6. According to Kestenbaum, his signature too was forged. *Id.*, Ex. A ¶ 13.

Additionally, AXA points to facts indicating that Mrs. Adler was in Ohio and not New York on the day alleged as the date the Trust was executed. In support, AXA includes in its papers the testimony of Mrs. Adler's hairdresser and phone records showing that calls were made to and from her apartment at times that corroborate the hairdresser's testimony and support a conclusion that she did not travel to New York on that date but rather had her hair done. *See* AXA Equitable Life Insurance Company's Statement of Undisputed Material Facts in Supp. of its Mot. for Partial Summ. J. ("AXA 56.1"), ¶¶ 26-30.

Mrs. Adler's daughter, Judith Abrams, testified that the Trust Agreement signature held out as Mrs. Adler's did not appear similar to other, genuine signatures of Mrs. Adler. *Id.* ¶ 39. Although Judith Abrams held a power of attorney for Mrs. Adler at that time, she did not sign the Trust Agreement, nor authorize anyone else to do so. *Id.* ¶ 40. A handwriting expert determined the signature on the Trust was not genuine. *Id.* ¶ 45. Rubenstein, the trustee, did not see Mrs. Adler on March 2, 2007 in New York, signed the Trust Agreement outside of Mrs. Adler's presence, *id.* ¶ 47, and cannot recall ever having spoken to or met Mrs. Adler. *Id.* ¶ 48. AXA has thus put sufficient facts before the Court to raise an issue of fact as to the validity of the Trust, and by extension the Policy.

### C. Improper procurement of the Policy

In April 2007, Mr. Rubenstein on behalf of the Trust applied for the Policy with AXA, despite never having met or spoken to the insured, Mrs. Adler. AXA 56.1 ¶ 48. According to AXA, the procurement of the Policy was improper because it was effected based on

9

misrepresentations and as part of a STOLI scheme wherein the true beneficiary lacked an interest in the insured.

*1. Misrepresentations.*

While the policy application claimed Mrs. Adler had an annual income of $1.5 million and assets in excess of $12 million, she in fact lived in a rental apartment in Ohio, had an annual income under $16,000 and a net worth of less than $100,000. *Id.* ¶¶ 27, 62-63. SF disputes the truth of these claims. Settlement Funding, LLC's and Life Settlement Corporation's Resp. to Rule 56.1 Statement and Additional Statement of Uncontested Facts in Opp. to AXA Equitable Life Insurance Company's Motion for Partial Summary Judgment ("SF Opp. 56.1"), ¶ 63.

Additionally, in March and April 2007, two other $5 million policies insuring Mrs. Adler's life were taken out, one with John Hancock Life Insurance Company, naming Chaim Citronenbaum as trustee, and one with Principal Life Insurance Company, naming Alan Rubenstein as Trustee. This contradicted Rubenstein's representation on the AXA application that only one life insurance policy would be obtained. AXA 56.1 ¶¶ 58-61.

As part of its underwriting process, and per industry standard, AXA required an inspection report to verify the information contained in the application. The investigator creating this report on behalf of AXA interviewed an individual representing himself as Allan Goldstein, Mrs. Adler's accountant, who confirmed the financial details in the application. *Id.* ¶¶ 17-19. However, Mr. Goldstein was not her accountant—a man named Aron Bloch had been her accountant for over 15 years. Affidavit of Gregory J. Star in Support of AXA Equitable Life Insurance Company's Opp. to Settlement Funding LLC's and Life Settlement Corporation's Mot. For Partial Summary Judgment ("Star Aff."), Ex. D. Neither Mrs. Adler's daughter nor her close friend knew of Allan Goldstein. *Id.* ¶¶ 20-21. No one by the name of Allan Goldstein ever lived or worked at the address he provided, and there is no Ohio CPA by that name. *Id.* ¶ 20.

*2. STOLI allegations.*

As noted above, "STOLI" is an acronym for "stranger-originated life insurance," a practice by which an insured unlawfully procures a policy for the "sole purpose of transferring it, directly or indirectly, to an investor," who has no legally-recognized interest in the life of the insured and stands to profit at the death of the insured. *Penn Mut. Life Ins. Co. v. Wolk*, No. 09 CV 1808, 2010 WL 2594876, *1 (S.D.N.Y. June 28, 2010). Such schemes fall afoul of the insurable interest rule, which is well-rooted in New York law and operates to prevent the

issuance of "wager" life insurance policies. *See Angel*, 530 F.Supp.2d at 652; New York Ins. Law § 3205(b)(2).[2] As Justice Holmes explained, "[a] contract of insurance upon a life in which the [policy owner] has no interest is a pure wager that gives the [policy owner] a sinister counter interest in having the life come to an end." *Grigsby v. Russell*, 222 U.S. 149, 154-55 (1911).

To determine whether a trust holding an insurance policy is a sham designed to evade the insurable interest rule or a genuine, good-faith assignment, courts consider factors such as whether the insured paid premiums, the length of time the insured held the policy before assigning it, whether the trust was executed contemporaneously to the policy application, and whether a subsequent purchaser of the policy was involved in the trust agreement. *Id.* at 654-655. The facts here are at a minimum suggestive of a STOLI scheme.

## D. Conclusion

As discussed above, while an incontestability provision may not yield to challenges based solely on a lack of insurable interest or material misrepresentations, the aggregate allegations brought here involving both lack of insurable interest *and* fraud, and arising from a context of allegedly widespread, systematic fraud involving careful planning, multiple policies, imposters, forgeries, and misstatements, all in pursuit of an improper STOLI scheme, raise additional material issues of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). As a consequence, summary judgment on this prong of SF's motion is herewith denied.

## III. Remaining issues for resolution

### A. SF's alternative arguments for liability

SF argues several alternative theories that it claims entitle it to summary judgment even if the Policy is found invalid. It argues that despite any infirmities at inception, AXA's challenge to the validity of the Policy fails based, among other things, on principles of estoppel, since SF relied on AXA's representations concerning the validity of the Policy, and AXA accepted later SF's performance on the Policy (i.e. payment of premiums); Mrs. Adler's subsequent ratification; AXA's admission that "unless and until the court declares the Adler Policy void *ab*

---

[2] "No person shall procure or cause to be procured, directly or by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are payable to the person insured or his personal representatives, or to a person having, at the time when such contract is made, an insurable interest in the person insured." N.Y. Ins. Law § 3205(b)(2) (McKinney 2006).

*initio*, it remains in force"; the presumption of validity enjoyed by trusts; and AXA's failure to join required parties.

To the extent that these theories have merit—and several of them may—they are insufficient to warrant summary judgment in light of the facts that AXA has put in issue. One claim that demands fuller treatment relates to joinder of required parties.

### B. Failure to join required parties

SF argues that the Trust beneficiaries are required parties, and AXA's failure to join them warrants a dismissal of AXA's claims. This issue has come up previously in this litigation. On its motion to dismiss AXA's counterclaims, SF argued that the fact that Trust beneficiaries had not been joined within the Court's Pre-Trial Scheduling Order constituted grounds for dismissing the counterclaims based on the failure to comply with a Court order. I ultimately denied that motion because on a motion to dismiss the non-moving party receives the benefit of every doubt. I noted, however, that the issue may warrant further attention on summary judgment, and therefore address it in full here.

*1. Whether the Trust beneficiaries are required parties.*

Rule 19 of the Federal Rules of Civil Procedure provides that "required parties" must be joined if "feasible." Fed.R.Civ.P. 19(a); *Laine v. Pride*, 2010 WL 199927, *9 (S.D.N.Y. 2010). A person is a required party if

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

*Id.* Whether a particular party must be joined out of necessity requires a fact-intensive determination. *Laine*, 2010 WL at *9 (*citing* 7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1604, *available at* FPP § 4425 (Westlaw)). In New York, courts have generally held that trust beneficiaries are "necessary" parties to disputes arising in relation to a trust. *See, e.g., Du Pont-De Bie v. Tredegar Trust Co.*, 61 A.D.3d 610, 611 (1st Dept. 2009); *Fagan v. Nowitz*, 65 A.D.3d 1184, 1185 (2d Dept. 2009); *Bankers Trust Co. v. Manufacturers Nat. Bank of Detroit*, 139 F.R.D. 302, 310 (S.D.N.Y. 1991).

12

The parties alleged to be required here are the beneficiaries of the Trust, Mrs Adler's two daughters and son in law. New York law posits that beneficiaries of a trust, at least in an action such as this, are required parties. Even if this action could be resolved without a declaration of the validity of the Trust, the beneficiaries may have independent claims on the Policy proceeds. Should the resolution of this case ultimately award the Policy proceeds to SF, such a judgment would impede any interests in or claims to the proceeds that the beneficiaries may have; moreover, given any potential claims the beneficiaries could raise, a judgment for SF would leave AXA subject to a substantial risk that it would incur double obligations on the Policy. *See* Fed.R.Civ.P. 19(a)(1)(B)(i-ii). Accordingly, the beneficiaries are required parties as a matter of New York law, and as a practical matter to the extent that their fortunes are tied to those of the parties already here.

2. *Whether joinder is feasible.*

The inquiry does not end there, because "[j]oinder of a party is not feasible where the court's subject matter jurisdiction rests on diversity of citizenship and joining the party to the action would destroy complete diversity." *LoCurto v. LoCurto*, No. 07 Civ. 8238 (NRB), 2008 WL 4410091, at *4 (S.D.N.Y. Sept. 25, 2008). AXA is a New York insurance company, and AXA asserts, and SF does not deny, that the beneficiaries are New York residents. *See* Oral Arg. Hr'g Tr. 35:9-13; 46:19-22 Sep. 8, 2010. Their interests are of course adverse to AXA's, and so their joinder would destroy diversity and divest this court of jurisdiction. In other words, under Rule 19 and the cases construing it, continuing with less than all required parties is preferred to dismissing completely.

3. *Whether the action may proceed absent necessary parties.*

If joinder of a necessary party is not feasible, then the court must consider whether in "equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed.R.Civ.P. 19(b). The factors at play in determining whether a litigation may proceed in the absence of a required party are:

> "first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether

13

the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

Fed.R.Civ.P. 19(b). The Supreme Court has summarized these four factors in these terms: (1) whether the party sought to be joined has an interest in having a forum and whether an adequate alternate forum exists; (2) the interest of the party seeking joinder in avoiding "multiple litigation, or inconsistent relief, or sole responsibility for a liability that he shares with another;" (3) "the interest of the outsider whom it would have been desirable to join;" (4) "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *See Randolph Foundation v. Duncan*, 2002 WL 32862, *7 (S.D.N.Y. 2002) (*citing Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109-11 (1968)); *see also Klockner Stadler Hurter, Ltd. v. Insurance Co. of Pennsylvania*, 785 F.Supp. 1130, 1133 (S.D.N.Y. 1990) (discussing *Provident Tradesmens'* analysis of Rule 19(b)'s four factors); *Ente Nazionale Idrocarburi v. Prudential Sec. Group*, 744 F.Supp. 450, 458-62 (S.D.N.Y. 1990). "Rule 19(b), however, does not require that every factor support the district court's determination." *Universal Reinsurance Co., Ltd. v. St. Paul Fire and Marine Ins. Co.*, 312 F.3d 82, 88-89 (2d Cir. 2002). "The major question is whether the court can render a decision which will not impair the rights of the absent party." *Ente Nazionale Idrocarburi*, 744 F.Supp. at 456 (*citing* J. Moore *et al.*, Moore's Federal Practice ¶ 19 .05[2] n. 6, at 19-77); *see also Lipton v. Nature Co.*, 781 F.Supp. 1032, 1034 (S.D.N.Y.1992) ("the Rule 19 motion regarding indispensability of parties ... [is] addressed to the court's equitable discretion.").

Dismissal here would be a drastic and unjustified step. "[V]ery few cases should be terminated due to the absence of non-diverse parties unless there has been a reasoned determination that their non-joinder makes just resolution of the action impossible." *Jaser v. New York Property Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987).

Continuing this action under Rule 19(b) will not prejudice the beneficiaries nor the parties. The beneficiaries have been on notice of this lawsuit since June 2010 at the latest, when all three were deposed with at least two were represented by counsel. *See* Star Aff., Exs. D, E; Decl. of Ina M. Berlingeri in Supp. of Settlement Funding, LLC's and Life Settlement Corporation's Opp. to AXA Equitable Life Insurance Co.'s Mot. for Partial Summ. J. ("Berlingeri Decl."), Ex. F. The fact that the Trust beneficiaries knew about this lawsuit and had

14

advice of counsel, yet opted not to join provides the greatest assurance that the court may proceed without them in "equity and good conscience." Fed.R.Civ.P. 19(b).

Moreover, no action is pending elsewhere that would afford either plaintiff or counter-claim plaintiff the opportunity to seek relief, were this action dismissed. The entire corpus of the Trust consisted of the Policy, and since the Policy has been sold, the Trust ostensibly holds no more property, and the risk that this lawsuit poses to the Trust beneficiaries is accordingly *de minimis*.

Finally, at this stage in the scenario, the Trust beneficiaries' interests are not wholly distinct from the interests of SF – both essentially seek in the first instance to have the Policy declared valid and enforceable. Should that happen, their interests of course will quickly part ways. But even if a judgment is ultimately rendered in favor of SF, it could be fashioned so as to reduce the potential for prejudice to the beneficiaries, for instance by issuing a temporary stay on the payment of any proceeds to allow the assertion of any related claims as between potential beneficiaries of the death benefits. The commencement of a separate action would have some slight overlap, but the claims as between SF and the beneficiaries would ultimately be sufficiently distinct from those raised here as to avoid excessive redundancy and waste of judicial resources.

### C. SF's claim for breach of contract (Count II).

SF argues that since the Policy is valid, AXA is in breach of contract for (1) contesting the validity of the Policy after expiration of the incontestability clause, and (2) failing to pay benefits due under the Policy. AXA counters that the Policy is void *ab initio*, and it cannot have breached a non-existent contract. In the event the Policy is found valid, it maintains, it should not be held liable for properly seeking a judicial declaration concerning the validity of the Policy, particularly in view of its many statements that it will pay a claim if the Court declares the Policy valid.

As many jurisdictions recognize, an action for declaratory judgment determining the validity of a contract does not constitute a repudiation of contractual obligations. *See, e.g., Landwehr v. F.D.I.C.*, No 09 CV 0716, 2010 WL 3452345, *8 (D.D.C. Sep. 3, 2010) (commencement of a declaratory judgment action does not constitute an anticipatory repudiation); *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F.Supp.2d 562 (D. Del. 2009) (collecting cases).

15

Thus, unless and until the Policy is declared valid and AXA repudiates its current position, no reasonable fact finder could conclude that AXA is in breach or anticipatory breach of any obligations. Moreover, SF's rights under the Policy will be determined through its claim, in Count I, for recovery of insurance proceeds. Its claim for breach of contract is therefore redundant, and it has not argued otherwise. SF has failed to show that, as a matter of law, it is entitled to summary judgment on its contract claim, and has failed to raise any factual issues to be tried in connection with this claim. Accordingly, its motion for summary judgment on this claim is denied, and AXA's motion for summary judgment dismissing this claim is granted.

### D. The Ohio Viatical Settlements Act claim (Counterclaim Count III)

SF seeks dismissal of AXA's counterclaim under the Ohio Viatical Settlements Act, Ohio Rev. Code Ann. § section 3916.01 *et seq.* ("Ohio Act"). AXA's counterclaim asserts that the sale of the Policy from the Trust to LSC violated section 3916.16 of the Ohio Act, which prohibits the purchase of a Policy less than five years after its issuance. The sale also violated section 3916.171, which prohibits a party from recklessly entering into a life settlement contract involving a policy obtained by fraud or fraudulent concealment, for the purpose of misleading and with intent to defraud the issuer of the policy.

SF does not dispute that the Policy was sold less than five years after it issued. AXA 56.1 ¶¶ 13, 30. As noted above, significant facts surround the question whether the Policy was procured through fraud, and LSC's alleged recklessness and intent are issues of fact to be determined at trial. *Angel*, 530 F.Supp at 656 ("cases that turn on the issue of intent are generally not appropriate for summary disposition").

The question whether the Ohio Act applies here is a more difficult one. Rather than argue under a conflict of laws paradigm, the parties point to specific language they claim governs the Ohio Act's reach. AXA points to one provision and asserts that the Ohio Act applies to any insurance policy that impacts the rights of a resident of Ohio or bears a reasonable relationship to the state of Ohio, regardless of where the policy was issued. SF points to two separate provisions that state:

> (B)(1) If there is more than one owner on a single policy and the owners are residents of different states, the viatical settlement contract shall be governed by the law of the state in which the owner having the largest percentage ownership of the policy

16

> resides or, if the owners hold equal ownership, the state of residence of one owner agreed upon in writing by all owners.
>
> (2) If the viator is a resident of this state, all agreements to be signed by the viator shall provide exclusive jurisdiction to courts of this state and the laws of this state shall govern the agreements. Nothing in the agreements shall abrogate the viator's right to a trial by jury.

Ohio Rev. Code Ann. § 3916.02. Neither party provides much guidance, and it appears that no reported case discusses the applicability of the particular provisions under which AXA brings its claims. The first provision urged by SF applies to Policies with multiple owners. It offers no help because there was never more than one owner at a time. The second provision requires application of Ohio law if the viator, i.e. the owner of the policy, is an Ohio resident. Since the Policy's purported owner was the Trust, and the Trust is not an Ohio trust, this provision is likewise no help.

Reference to the provision urged by AXA is more fruitful. The substantive provisions AXA seeks to apply govern "policies." A policy includes "an individual or group policy, group certificate, or other contract or arrangement of life insurance *affecting the rights of a resident of this state or bearing a reasonable relation to this state, regardless of whether delivered or issued for delivery in this state*." Ohio Rev. Code Ann. § 3916.01(J) (emphasis added). By its terms, then, the Ohio Act may apply if the Policy here bears a reasonable relation to this state. AXA urges that it does because it was issued on the life of an Ohio resident. Whether this constitutes a "reasonable relationship" is a question of fact. Accordingly, SF's motion for summary judgment dismissing this claim is denied.

### E. Other Ohio claims

The parties assert various other claims under Ohio law in the event that Ohio law applies. These Ohio law claims are distinct from the Ohio Act claims, whose applicability is defined by statute, per the parties' arguments. Here, the parties assert claims in the event that Ohio law governs the dispute generally. AXA seeks a declaration that Ohio law applies to its insurable interest claims, and seeks dismissal of SF's claims for bad faith denial of coverage and "Tort Action" under Ohio law (Counts VI and VII).

17

The parties agree for the most part that Ohio and New York law do not differ on the issues raised here. *See* Settlement Funding, LLC's and Life Settlement Corporation's Memorandum of Law in Supp. of Mot. for Partial Summ. J. at 12; AXA Equitable Life Insurance Co.'s Memorandum of Law in Opp. to Settlement Funding, LLC's and Life Settlement Corporation's Mot. for Partial Summ. J. ("AXA Opp.") at 8, n. 12. However, AXA claims that one conflict does exist wherein Ohio, unlike New York, allows an insurer to challenge the validity of a life insurance policy based on a lack of insurable interest even after the close of the contestability period. AXA Opp. at 17. It cites two older cases, *Harris v. Sovereign Camp*, 1940 WL 2917, *2 (Ohio Ct. App. 1940) and *John Hancock Mut. Life Ins. Co. v. Snyder*, 3 N.E.2d 898, 900 (Ohio Ct. App. 1935). SF argues persuasively that these cases have been superseded by Ohio Code § 3915.05, which requires the inclusion of incontestability clauses and enumerates exceptions to their application—a lack of insurable interest is not among them. *See* SF at 12. Accordingly, I conclude that no conflict exists and therefore need not engage in a choice of law analysis. *I.B.M. Corp. v. Liberty Mut. Ins. Co.*, 33 F.3d 137, 143-44 (2d Cir. 2004).

Even if a conflict did exist, the choice of law analysis would come out in favor of applying NY law because the dispute's "center of gravity" is here. *See Maryland Cas. Co. v. W.R. Grace & Co.*, 332 F.3d 145, 151 (2d Cir. 2003); *Olin Corp. v. Ins. Co. of N. Am.*, 743 F.Supp. 1044, 1049 (S.D.N.Y. 1990). AXA points only to Adler's residence in Ohio, and asserts that the New York contacts are merely "sham" and "illusory" as a result of the impropriety of everyone involved in the transactions. Even if cloaked as they may be in fraud and wrongdoing, the greatest concentration of significant events and entities are nonetheless in New York:

- AXA is a New York corporation with its principle place of business in New York. SFOpp. 56.1 ¶ 73.
- Premium payments were made from the Trust's bank account in New York. *Id.* ¶ 87.
- Rubenstein is a New York resident and citizen. *Id.* ¶ 74.
- The Policy was delivered to Rubenstein in New York. *Id.* ¶ 82.
- The Trust is organized under New York law and has a New York address. *Id.* ¶ 75.
- The Policy application was a New York application, any Policy changes are subject to the NYS Insurance Department's approval, and AXA's representative indicated that AXA's intent with respect to the Policy would have been to comply with New York law. *Id.* ¶ 78-86.

Accordingly, AXA's motion for summary judgment dismissing SF's claims for "Tort Action" and bad faith denial of coverage under Ohio law is granted, and AXA's request for a declaration that Ohio law applies is denied.

### F. AXA's remaining requests.

AXA seeks dismissal of SF's claims for negligent misrepresentation and common law fraud (Counts II and V) and deceptive business practices (Count IV). While close, this must be denied. AXA also seeks a declaration that SF is not entitled to punitive damages. This motion, or arm of a motion, will likely be granted after trial, but not now. AXA's motion here must be denied.

### CONCLUSION

For the reasons described above, plaintiff's and counterclaim defendant's motion for summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED to the extent that it seeks dismissal of Plaintiff's claims for breach of contract, bad faith denial of coverage and Tort Action under Ohio law, and is otherwise DENIED.

The Clerk of the Court is instructed to close the relevant motions and remove them from my docket.

**SO ORDERED**
September 24, 2010
New York, New York

Hon. Harold Baer, Jr.
U.S.D.J.