UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SETTLEMENT FUNDING , LLC,<br><br>Plaintiff-Counterclaim Defendant,<br><br>- against -<br><br>AXA EQUITABLE LIFE INSURANCE CO.,<br><br>Defendant-Counterclaim Plaintiff. | Case No.: NO. 09-CV-8685-HB<br><br>**SETTLEMENT FUNDING, LLC'S AND LIFE SETTLEMENT CORPORATION'S REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO AXA EQUITABLE LIFE INSURANCE COMPANY'S MOTION UNDER RULES 50 OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

Plaintiff SETTLEMENT FUNDING, LLC ("Plaintiff") and Counterclaim Defendant LIFE SETTLEMENT CORPORATION ("LSC") ("Plaintiff" and "LSC" are collectively referred to as "SF"), respectfully submit this reply memorandum of law in further opposition to AXA EQUITABLE LIFE INSURANCE COMPANY'S ("AXA") motion for entry of judgment under Rules 50 and 52 of the Federal Rules of Civil Procedure ("Rule 50 Motion").[1]

## I.   PRELIMINARY STATEMENT

In its reply regarding the Rule 50 Motion, AXA claims that "the most important point" in this case is that "if there was never a policy, there was never a contestability clause." D.E. 194, at 5. Stated otherwise, AXA insists that it is entitled to contest the validity of a policy past expiration of the contestability period. This is contrary to the promises and representations made by AXA in the policy issued on the life of Ms. Esther Adler (the "Policy"), where AXA promised that it would "not contest the validity of this policy" after expiration of the contestability period. Plaintiff's Trial Exhibit 9, at

---

[1] In the reply, AXA insists that it is entitled to separate findings of fact and law pursuant to Fed. Civ. P. 52(a)(1). As per SF's opposition, the Court must decline AXA's unfounded invitation to completely disregard the verdict and substitute its own findings of fact with those of the jury. *Tennant v. Peoria & P.U.R.Y.Co.*, 321 U.S. 29, 35 (1944) ("[i]t is the jury, not the court, which is the fact-finding body"). In a footnote, AXA claims for the first time that it is entitled to a new trial, because the instruction to disregard Ms. Rose Ricciardi's testimony was not made during the trial. The argument was waived because it was not raised in the Rule 50 motion. Similarly, AXA's request for a new trial must be summarily denied as belated. Fed. R. Civ. P. 59(b) (motions for new trial must be filed no later than 28 days after entry of judgment). SF nevertheless disagrees with AXA on this issue and reserves the right to address it, should the Court decide to entertain it.

PEACHTREE-AXA000125. It is also contrary to the representations made by AXA to SF in February 2009 that the Policy was "in force" and "beyond the contestable date." Plaintiff's Trial Exhibit 18, at AXA-00889-0090. ***More importantly, AXA's statements are contrary to the judicial admissions and representations made to this Court that the Policy continues to exist and is fully enforceable to this day:* "*until this Court declares the Adler Policy void ab initio, it remains in force*.**" D.E. 58, at 14 (emphasis added). This is a judicial admission that is conclusive in this case, and AXA is precluded from asserting a different position. *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (citing 2 *McCormick on Evidence* § 254 (6th Ed. 2006)). In any event, AXA's continued insistence—despite its admissions, the verdict and the judgment sustaining the Policy's validity—is indeed a vindication of the jury's finding that AXA materially misrepresented the truth. D.E. 185, at 11-12. It is also proof that AXA will continue to misrepresent the truth, in a manner inconsistent with Fed. R. Civ. P. 11.

More importantly, AXA's position is contrary to New York law, as enunciated by the Court of Appeals in *New England Mutual Life Ins. Co. v. Caruso*, 73 N.Y.2d 74 (1989). There, the New York Court of Appeals held in no uncertain terms that the incontestability provision precluded claims that a policy was void *ab initio* due to claims of lack of insurable interest or fraudulent misrepresentations. In reaching that conclusion, the court noted that nothing in the statutory scheme of New York Insurance law made void *ab initio* those policies acquired in the manner charged by the plaintiff in that case. 73 N.Y.2d at 80-81 ("nothing in the statutory scheme makes void *ab initio* policies acquired by one lacking an insurable interest *or* forecloses the application of an incontestable clause to bar an insurer's disclaimer of liability"). The same is applicable here, as there is nothing in New York Insurance Law that makes void *ab initio* a policy that is obtained in the manner that AXA claimed yet failed to prove. To be sure, *Caruso* continues to be good law in New York; the New York Court of Appeals recently rejected several insurers' invitation to modify *Caruso* in the same manner AXA has done here. *Kramer v. Phoenix Life Ins. Co.*, 2010 WL 4628103, at n.3-4 (N.Y. November 17, 2010). That court also

confirmed that courts must follow the unambiguous language of New York Insurance Law, even when it is at odds with common law policies.

As per New York Insurance Law, life insurance policies must provide that "the policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue." N.Y. Ins. Law § 3203(a)(2). Here, it is undisputed that the Policy contained such a provision and that Ms. Adler died beyond the contestability period. Thus, and based on the record evidence, the jury found that AXA is barred from contesting the validity of the Policy. D.E. 185, at 5. There being no ambiguity in the statute's language, it must be honored, as AXA is simply not above the law.

In light of this, the Court should refuse AXA's invitation to ignore New York law and summarily deny the Rule 50 Motion, without more. Nevertheless, to the extent that AXA has raised issues in its reply which had not been raised in its original motion or only partially raised, it is necessary to address them at this time.

## II.    AXA'S CLAIM THAT RATIFICATION WAS IMPOSSIBLE IS FRIVOLOUS

AXA claims that no ratification of the Policy was possible because the notary whose name appeared on the trust instrument did not ratify his signature. D.E. 194, at 7-8. However, AXA does not cite a single statute or case to support the claim that Ms. Adler could not ratify the Trust or that the notary's ratification of the trust instrument was necessary, for that matter.

Under New York law, it is the grantor of the Trust (here, Ms. Adler) and not the notary who is the party to the trust instrument; a notary's role is simply to receive and certify a party's acknowledgement. *See* N.Y. Exec. Law § 135. Moreover, trusts and other instruments that require acknowledgment of a party's signature—such as quitclaim deeds[2]—are subject to ratification by the party. *See, e.g., De Tata v. Tress*, 4 A.D.2d 748 (2d Dep't 1957) (forgery of a wife's signature on quitclaim deed was later ratified by wife); *Lincoln Rochester Trust Co. v. Smith*, 158 N.Y.S.2d 367,

---

[2] Quitclaim deeds require acknowledgments. *See* N.Y. Real Prop. Law § 291. Acknowledgments are performed by notary's or other officers authorized by law. N.Y. Prop. Law § 298.

371 (N.Y. Sup. Ct. 1956) (a trust that might otherwise be declared invalid can still be upheld on the grounds of ratification). Therefore, only Ms. Adler's ratification was necessary, as a matter of law.

AXA also claims "SF offered no evidence that Mrs. Adler was aware of the particular Trust associated with the Policy, let alone that she or someone else with legal authority assented to the creation of the Trust." D.E. 187 at 14. It further claims that "there was no evidence that Mrs. Adler ratified any act." D.E. 194, at 8. In reality, however, what AXA wants is for the Court to disregard the record evidence or to consider its weight against SF.

For example, AXA wants the Court to give no weight to the undisputed fact that Ms. Adler signed a Part II the Policy application and that she was a willing and active participant in the procurement of insurance, submitting herself to a medical exam and answering questions addressed to the "proposed insured." Plaintiff's Exhibit 9 at 1140; *see also* D.E. 49 ¶72 (AXA admits that Ms. Adler signed Part II of the application); Tr. 267:14-20; Tr. 269:14-25; Plaintiff's Exhibit 1 at UP-003.[3] AXA also wants the Court to give no weight to Ms. Adler accountant's testimony that he was told by Ms. Adler about a family trust in connection with life insurance. Tr. 380:13-17; Tr. 385:14-17 ("Q: . . . Have you ever heard of the Esther Adler Family Trust before? . . . A    She did mention there was a trust in the context of that life insurance policy"). Similarly, AXA wants the Court to give no weight to the financial report prepared by the inspection vendor, Mr. Charles McCann, and considered by AXA in its underwriting, which unquestionably refers to the Trust and to "a direct interview" of Ms. Adler by Mr. McCann. Plaintiff's Exhibit 2 at AXA-002232 and 2236.

Indeed, AXA goes as far as suggest that the Court should disregard ***AXA's own admissions*** at trial regarding such interview, by improperly misquoting the testimony of its Vice President of

---

[3] AXA suggests that this evidence has no weight because it was signed weeks before the signatures on the trust instrument were purportedly forged. However, this does not change the fact that Ms. Adler actively participated in the procurement of the Policy. There is direct record evidence that the Policy had insurable interest, and therefore that there was no nefarious conspiracy in the procurement of the Policy and creation of the Trust. D.E. 192, at 17 n.8. There is also circumstantial record evidence that Ms. Adler authorized others to assist her in the procurement of the Policy, which would include the creation of the Trust. At the very least, it provides evidence to withstand AXA's claim of forgery, which required AXA to prove with clear and convincing evidence. *See infra*.

Underwriting, Ms. Barbara Peterson. In the reply, AXA contends that "[a]ll Ms. Peterson stated was

that Mr. McCann claimed in a report to have spoken with Mrs. Adler." D.E. 194, at 9. ***This is simply

false.*** In response to a line of questions posed by the Court, Ms. Peterson testified and admitted that

Mr. McCann in fact contacted Ms. Adler directly, without any reference to the inspection report:

| | |
|---|---|
| THE COURT: | Who is an inspection vendor? |
| [MS. PETERSON]: | It is the company that actually does the inspection interview with the client . . . . The inspector actually contacts the client as well as runs the credit check through the internet. |
| THE COURT: | ***Did he do either <u>here</u>?*** |
| [MS. PETERSON]: | ***<u>The inspection vendor contacted the client directly</u>***. |

Tr. 518:5-7, 518:24-519:1 (emphasis added).[4]

It is well settled that the Court may not consider the weight of the evidence. Indeed, the Court

must deny AXA's Rule 50 motion

> unless, viewed in the light most favorable to [SF], 'the evidence is such that, ***without weighing the credibility of the witnesses or otherwise considering the weight of the evidence***, there can be but one conclusion as to the verdict that reasonable men could have reached.' In other words, [a] judgment [under Rule 50] is to be granted only when there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of [AXA] that reasonable and fair minded [jurors] could not arrive at a verdict against [it].'

*Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir. 1993) (quoting *Simblest v. Maynard,* 427

F.2d 1, 4 (2d Cir. 1970) and *Mattivi v. South African Marine Corp.,* 618 F.2d 163, 168 (2d Cir. 1980)

(internal quotations omitted; emphasis added); *accord Fidelity and Guar. Ins. Underwriters, Inc. v.

Jasam Realty Corp.*, 540 F.3d 133, 142 (2d Cir. 2008). Moreover, the Court "must view the evidence

---

[4] The untenable and egregious litigation style of AXA and its counsel is further reflected by the claim that the "'evidence' that SF truly believes supports its ratification argument was the improper testimony of Rose Ricciardi concerning an alleged telephone conversation with Mrs. Adler." D.E. 194, at 8. ***Nowhere in the summation or the opposition to AXA's Rule 50 Motion did AXA even mention that testimony, so there is absolutely no basis—much less a reasonable one—for AXA to make such a claim***. Equally egregious is AXA's claim that SF violated the Court's order because it offered "extrinsic evidence" about the conversation between Ms. Adler and Ms. Ricciardi. D.E. 194, at 8. The record is clear that AXA only sought the exclusion of the recording and not the conversation. D.E. 117, at 9 ("For the reasons set forth above, AXA Equitable respectfully requests that the Court enter an order precluding any use or mention of the Recording at trial"). To be sure, no questions were posed by SF on the recording. Tr. 235:13-257:6 and esp. 251:12-13. What SF offered was direct evidence (not extrinsic) of an actual conversation that AXA well knows Ms. Ricciardi had. Tr. 251:12-13. Finally, it is noteworthy that AXA failed to ask for any corrective instructions during the trial and, worse yet, failed to make any cross examination of Ms. Ricciardi to address the purported prejudice of the testimony. Therefore, it waived any complaint it may have to that effect.

in a light most favorable to [SF] and grant [SF] every reasonable inference that the jury might have drawn in its favor..'" *Samuels*, 992 F.2d at 16 (quoting *Mattivi,* 618 F.2d at 167).

As noted above, the record contains evidence that supports the finding that Ms. Adler actually obtained the Policy, having personally and actively participated in all aspects of the application process (including the medical and financial underwriting), that she signed the application, and—most importantly—that she knew about the Trust in connection with the Policy. In deciding AXA's motion, the Court cannot assess the credibility of any of these witnesses or weigh this evidence, and must view all of it in a light most favorable to SF, granting all reasonable inferences in SF's favor.

Consequently, even if the Policy and/or the Trust suffered any of the defects of which AXA complains (which is not the case), the Court must still refuse to issue judgment in favor of AXA under Rule 50, in light of the ample evidence supporting ratification of the Policy and the Trust.

## III.   CONTRARY TO WHAT AXA SUGGESTS, SF DID NOT ADMIT THAT THERE WAS FORGERY OR THAT THE TRUST WAS INVALID

In its reply, AXA makes the outrageous claim that SF admitted that Ms. Adler's signatures on the Policy application and the trust instrument were forged. D.E. 194, at 3 ("SF could not possibly argue that the signature of Mrs. Adler on the Trust was anything but a forgery. SF has also admitted that the same forged signature appears repeatedly in the Policy application, and thus that the application was forged"). However, AXA does not cite a single document in the record that supports such an egregious claim.[5] Moreover, the record is clear that SF has repeatedly claimed that the mere fact that Ms. Adler did not sign the documents does not mean that her signature was forged, because she could have either authorized her signature or ratified the transaction conducted with the so-called forged signatures. *See, e.g.,* D.E. 100, at 8-9. SF has also claimed that AXA has no standing to contest

---

[5] AXA also egregiously claims that SF's counsel admitted that Ms. Adler's signature was forged. D.E. 194, at 3. The purported admission by SF's counsel (contained in D.E. 195, Ex. A (5:12-8:17)) is the statement that the Policy application contained two different signatures, but that—as AXA admitted—one those signatures was indeed Ms. Adler's. As explained herein, the fact that Ms. Adler did not sign a part of the Policy application or the trust instrument does not mean that there was forgery, because Ms. Adler could have authorized someone else to sign on her behalf. In any event, it was AXA who alleged that there had been forgery and who failed to meet its burden of proof on that allegation. SF, on the other hand, offered evidence that Ms. Adler authorized the documents and/or ratified the Policy and the Trust.

6

the validity of the trust. *See* Joint Pretrial Order, at 6; *see also In the Green*, 2007 WL 2108246 (N.Y.

Sur. June 26, 2007) (beneficiaries of a decedent's estate had no standing to challenge invalidity of *inter*

*vivos* trust); *Davis v. Hunter*, 323 F. Supp. 976 (D. Conn. 1970) (children of grantor lacked standing,

basic to federal court's subject matter jurisdiction, to seek invalidity of *inter vivos* trust).

In fact, SF submitted a proposed jury instruction submitting that a person—such as Ms. Adler

here—may authorize others to sign on his or her behalf. *See* D.E. 175, at 34. The proposed instruction

also submitted that AXA (not SF, as AXA has suggested) had the burden to prove such forgery, with

"clear and convincing evidence." *Id.* The Court essentially adopted SF's proposed instruction and read

the following instruction to the jury:

> You have heard that AXA alleges that the signature of the insured, Esther Adler,
> was forged the on documents forgery is considered a kind of fraud, and it is defined as
> the fraudulent making of a document to the prejudice of another's rights for the purpose
> of fraud and deceit.
>     However, *a person can authorize another person to sign a document on his or
> her behalf*. *When one person authorizes another to sign a document on his or her
> behalf, the signing of the document in that other person's name is not a forgery*. And
> if you find that this is what happened here, you may find that this was not a forgery.
>     [T]he proponent must prove its contentions with clear and convincing evidence
> a higher burden than the usual civil case where merely a preponderance of the evidence
> is sufficient.

Tr. 788:6-21 (emphasis added).[6]  This charge of the Court was correct, as a matter of law.

In any event, the jury clearly did not buy into AXA's claim that the signatures were forged. To

be sure, "[t]he law presumes the jury made the findings necessary to support its verdict, and the

required findings are controlled by the court's instructions to the jury." *DMI, Inc. v. Deere & Co.*, 802

F.2d 421, 425 (Fed. Cir. 1986). Moreover, as explained in more detail above and SF's opposition to the

Rule 50 Motion, there is record evidence supporting the finding that Ms. Adler consented to the Trust

---

[6] The jury was also correctly charged with an instruction regarding ratification, which provides in part:
> AXA claims that the signature of Esther Adler on the trust agreement by which the trust was created was
> forged. If you recall, I gave you the distinction where not every signature that you see that is not put there
> by the person whose name is on the document is necessarily a forgery. If you find that Esther Adler or
> someone else with legal authority assented to the creation of the trust and took no action to repudiate the
> trust after knowing about it and that it was not the signature of the Esther Adler and that Life Settlement
> Corporation relied on her silence and inaction, you may find that the trust agreement was ratified.

Tr. 790:20-791:23.

and the Policy and/or ratified these. Thus, AXA's request for this Court to disregard the verdict and

substitute it with a assertion that was rejected by the jury must be summarily dismissed.

## IV.    AXA'S NEW ARGUMENT THAT NEW YORK INSURANCE LAW DECLARES THE POLICY VOID *AB INITIO* IS UNTENABLE

For the first time in this action, AXA argues that Section 3205(c) of New York Insurance Law

renders the Policy *ab initio* if it was "made or effectuated through a forgery." D.E. 194, at 3-4. More

specifically, AXA claims that "[w]here the insured's signature is forged on a policy application,

Section 3205(c) is violated and no valid contract of insurance ever existed." D.E. 194, at 5.

Assuming that AXA did not waive this argument for failing to raise it in its pretrial submissions

and prior to the trial, the Court must nevertheless dismiss it as specious and unfounded. First, as

explained above, there is sufficient record evidence to support the findings against AXA on its claim

that there was forgery; the jury simply did not find for AXA on that issue and any attempts to sway the

Court to infer anything different or against SF on that issue is improper.

Second, what the cited section requires is simply that the insured "applies for or consents in

writing to the making of the contract" of insurance, without more. N.Y. Ins. Law § 3205(c). Notably,

nowhere in Section 3205(c) did the legislature require that consent be provided in a specific manner.

Nevertheless, AXA apparently wants the Court to ignore the blatant fact that Ms. Adler did consent in

writing to the Policy by signing—by her own hand—Part II of the Policy application. Otherwise stated,

contrary to what AXA claims, there was in fact written consent by Ms. Adler to the Policy application.

Indeed, nowhere in the cited statute did the legislator preclude the application of the general

principles of agency which allows a person to authorize another to sign documents on his or her behalf.

*Matter of Knox*, 64 N.Y.2d 434, 445-446 (1985). Therefore, even assuming that Ms. Adler had not

actually signed the application (which she did), the fact that she authorized another to sign it on her

behalf would be a valid expression of consent under New York law. Indeed, as a matter of New York

law, an insurance company is legally estopped from asserting the invalidity of a policy on the basis of

8

lack of written consent by the insurer where the insurer's agent submits the application. *See, e.g., Boylan v. Prudential Ins. Co. of Am.*, 42 N.Y.S. 52, 53 (N.Y. Sup. 1896); *Isaacs v. Equitable Life Assur. Soc. of U.S.*, 114 Misc. 468 (N.Y. Sup. 1921).

Consequently, the Court must reject AXA's new (and belated) argument that the Policy is void *ab initio* based on Section 3205(c) of New York Insurance Law.

## V.   COURT MUST REFUSE TO CONSIDER AXA'S UNFOUNDED ATTEMPTS TO HAVE THE COURT DISREGARD THE JURY'S VERDICT

AXA insists on having the Court disregard the jury's verdict, without providing any legal basis. For example, AXA cites no legal authority whatsoever to support its belated claim that the jury instructions regarding estoppel and negligent misrepresentation (which were submitted to the jury with AXA's express consent) were somehow incorrect or incomplete, as it now suggests. D.E. 194, at 10 n.14. Instead, AXA continues to intentionally and improperly muddle the principles of estoppel and negligent misrepresentation, in an attempt to confuse the Court as to what are the applicable elements as to each of these independent principles of law. As per SF's opposition, these issues were properly submitted to the jury pursuant to instructions to which both parties agreed and the jury rendered its judicious verdict based on those instructions and upon the record evidence submitted by the parties.

AXA also cites no legal authority upon which it supports its belated argument that its counterclaims (which were submitted to the jury with AXA's express consent)[7] are equitable or that SF was somehow not entitled to have its legal claims decided by a jury simply because AXA filed inverse counterclaims of declaratory judgment to avoid liability for SF's claims. To be sure, AXA failed to address the U.S. Supreme Court and Second Circuit precedent which states that declaratory judgment claims are neither equitable nor legal. *Gulfstream Aerospace Corp. v. Mayacamas Corp*., 485 U.S.

---

[7] In the last footnote of its reply, AXA incredibly argues that it actually objected to the submission of the so-called equitable issues to the jury, simply because it filed a motion for summary judgment arguing there were no triable issues and because there was a pretrial order that imposed a deadline for the parties to submit proposed jury charges and verdict sheets, if any. Not once in the year this case was pending before the trial began did AXA ever objected to the submission of any issue to the jury nor did it ever argue that this case involved equitable issues that were for the Court to decide. The Court should flatly ignore this frivolous argument by AXA.

271, 284 (1988); *Amer. Safety Equipment Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 824 (2d Cir. 1968). Similarly, AXA also failed to address that, as per the U.S. Supreme Court, SF's right to jury trial is not affected by AXA's filing of inverse counterclaims. *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 504 (1959). Apparently, AXA expects the Court to curtail SF's constitutional right to jury trial based on the unfounded belief of its legal counsel, something the Court should refuse to entertain.[8]

**WHEREFORE**, Plaintiff respectfully requests this Court deny AXA's Rule 50 Motion.

---

[8] Finally, it is necessary to address another of AXA's frivolous arguments. In its reply, AXA claims that "there was a finding of fraud in connection with the procurement of the Policy." D.E. 194 at 7 n.8. In its response to Rubenstein's motion under Rule 50, which AXA incorporated by reference to its reply, AXA reiterates that the jury "found that Rubenstein's co-conspirators committed fraud." D.E. 196 at 3. These statements are completely and patently false. After weighing all of the evidence offered, including the evidence that AXA had available at the time of the Policy application (such as the signature pages of the relevant documents), and after weighing the credibility of AXA's own witnesses, the jury expressly found that AXA did not reasonably rely on the representations made by Rubenstein in the Policy application. Verdict Sheet at 4. This means that AXA was unable to prove one of the necessary elements of fraud by clear and convincing evidence. *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir. 1997) ("Under New York law, *for a plaintiff to prevail on a claim of fraud, he must prove five elements by clear and convincing evidence*: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff") (emphasis added); *see also* Jury Charge at 47 (same). To support its false representations, AXA contends in its response to Rubenstein's Rule 50 motion that, under New York law, a party claiming conspiracy to defraud need not prove all the elements of fraud. D.E. 196 at 3. This is *also* false. As per one of the cases cited by AXA, "[t]o establish a claim of civil conspiracy, plaintiff ***must demonstrate the underlying tort***, **plus** the [four elements of conspiracy]." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009) (emphasis added); *see also World Wrestling Federation Entertainment, Inc. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001) (same). Though those cases support the position that a plaintiff need not prove that *each defendant* committed each of the elements of the tort, this is of no consequence herein, as AXA still needed to prove each and every one of the elements of fraud, something it was unable to do.

Respectfully submitted,
Dated: January 3, 2011.

GREENBERG TRAURIG, PA
Attorneys for Plaintiff Settlement Funding,
LLC and Counterclaim Defendant Life
Settlement Corporation

By: /s/ Ina M. Berlingeri

JESÚS E. CUZA
Admitted Pro Hac Vice
INA M. BERLINGERI
Admitted Pro Hac Vice
PHILIP H. COHEN                                JOHN MCMANUS
GREENBERG TRAURIG, LLP                         Admitted Pro Hac Vice
200 Park Avenue                                BRIAN H. KOCH
New York, New York 10166                       Admitted Pro Hac Vice
Telephone: (212) 801-9200                      GREENBERG TRAURIG, P.A.
Facsimile: (212) 801-6400                      401 East Las Olas Blvd., Suite 2000
                                               Fort Lauderdale, Florida 33301
                                               Telephone: (954) 765-0500
                                               Facsimile: (954) 765-1477